[No. B189567. Second Dist., Div. Seven. Apr. 22, 2008.]

GINA ZANONE, Plaintiff and Respondent, v.
THE CITY OF WHITTIER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 2.a. and b. and 4. through 7. of Discussion.

176

## COUNSEL

Ferguson, Praet & Sherman, Diana L. Field; Greines, Martin, Stein & Richland, Timothy T. Coates and Jens B. Koepke for Defendant and Appellant.

Grobaty & Pitet, Michael J. Grobaty, Christopher L. Pitet and Sommer A. Salam for Plaintiff and Respondent.

## OPINION

**PERLUSS, P. J.**—The City of Whittier appeals from the judgment entered in favor of Gina Zanone, a former Whittier police officer, after a jury awarded her $1.25 million in her action for sex discrimination, harassment and retaliation. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### 1. *Zanone Joins the Whittier Police Department*

Zanone joined the Whittier Police Department in January 1997 after 10 years working for the Gardena Police Department as both a patrol officer and a detective. Approximately six months after she began Zanone was transferred to patrol duty in the City of Santa Fe Springs, which was policed by Whittier pursuant to a contract.[2] Zanone had grown up in Santa Fe Springs and was living there at the time of the transfer.

In her first annual performance evaluation for the year 1997 Zanone received an overall rating of "competent plus."[3] In her annual performance evaluation for 1998, completed by her supervisor during that time, Sergeant Rod Bryant, Zanone received an overall rating of outstanding. For the year 1999 she also received an overall outstanding rating from Sergeant Bryant, who was her supervisor for the first 10 months of 1999, and Sergeant Gary Hancock, who was her supervisor for the last two months. In addition to these outstanding evaluations, Zanone was presented with the officer of the year award by a local post of the Veterans of Foreign Wars for her services as a patrol officer in Santa Fe Springs for 1999.

### 2. *Zanone Becomes a Detective in Santa Fe Springs*

In late 1998 Zanone unsuccessfully applied to become a detective in Santa Fe Springs.[4] She reapplied in 1999 and was transferred in January 2000 to the detective bureau, which was staffed with a sergeant and four detectives, one of whom was designated the "lead detective" with supervisory powers. By

---

[1] As we must, we state the facts in the manner most favorable to the judgment, resolving all conflicts and drawing all reasonable inferences in favor of Zanone. (*Thompson v. Miller* (2003) 112 Cal.App.4th 327, 330 [4 Cal.Rptr.3d 905]; see *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619], overruled on other grounds by *Privette v. Superior Court* (1993) 5 Cal.4th 689, 696 [21 Cal.Rptr.2d 72, 854 P.2d 721].)

[2] Although Santa Fe Springs appears to have had a separate police department, we refer to the Santa Fe Springs Police Department and the Whittier Police Department interchangeably as the Department.

[3] The ratings listed on the printed employee evaluation form, adjacent to empty boxes to be checked, were unsatisfactory, improvement needed, competent, very good and outstanding. The record does not indicate how the rating of "competent plus" was shown.

[4] Zanone had submitted an application to take the written test for sergeant in April 1998, but did not qualify for the test.

Department order the position was a five-year "special assignment"; however, pursuant to a memorandum of understanding between the police officers' union and Whittier, detectives could be transferred from the detective bureau without cause on the anniversary date of the special assignment. Zanone was the first female detective ever assigned to the Santa Fe Springs detective bureau.

For approximately the first 10 months Zanone was in the detective bureau, Jeff Piper was the lead detective. During this period Zanone did not receive any complaints or reprimands relating to her performance. In mid-October 2000, after Michael Redmon replaced Piper as lead detective and Kent Miller became Zanone's partner, the situation changed. On November 30, 2000 Zanone attended a meeting with Redmon and Sergeant Hancock, who had taken command of the detective bureau, at which Zanone was informed about several deficiencies in her performance and was advised she needed to improve communication with her partner and other coworkers and to be a better team player by, among other things, participating in the execution of search warrants and more effectively handling her caseload. According to Zanone, at the close of the meeting Hancock told her, "Gina, I don't know what's going to happen if this doesn't improve. I don't know where it's going to go from here."

### 3. *Zanone's December 2000 Discrimination Complaint*

Zanone believed she had been unjustifiably criticized at the November 30, 2000 meeting in light of her outstanding performance reviews as a patrol officer, including positive comments on the thoroughness of her investigations, the lack of any indication during her first 10 months with the detective bureau her performance was in any way deficient and what she had perceived as a positive working relationship with Piper and her previous partner. Based upon Hancock's ominous warning, Zanone also believed her job was in jeopardy. Consequently, on December 5, 2000, the same date Zanone received a memorandum documenting the November 30, 2000 meeting, Zanone informed Whittier's human resources department she thought she was being treated differently because she was a woman.[5] Zanone subsequently explained she had seen this kind of treatment occur during her

---

[5] A copy of the memorandum documenting the meeting was placed in Zanone's personnel file with a notation by Sergeant Hancock, "refused to sign." Zanone testified she had never been asked to sign the memorandum. Hancock testified he did not recall whether he had asked her to sign it, but conceded she had no obligation to do so.

time at the Gardena Police Department and wanted to stop to it before it worsened. Zanone was also concerned there were no female supervisors at the Department.

Whittier hired a labor attorney, Linda Jenson, who had represented Whittier on a number of matters over the previous 10 years, to conduct an investigation of Zanone's complaint. After interviewing, among others, Zanone, Redmon, Piper and Hancock, Jenson concluded there was a legitimate, work-related and nondiscriminatory reason for the November 30, 2000 meeting and Zanone had not been subjected to sex discrimination or harassment. However, Jenson did not interview officers identified by Zanone, including her former partner and several female officers, who may have supported Zanone's belief the deficiencies for which she had been admonished were pretextual. Zanone was informed of the results of the investigation in a memorandum dated December 21, 2000.

### 4. *Zanone's Experience in the Detective Bureau After Investigation of Her Discrimination Complaint*

On February 1, 2001 Zanone received her first annual performance evaluation as a detective for the year 2000. In contrast to her outstanding ratings as a patrol officer, Zanone received an overall rating of competent. The evaluation included criticisms in a number of areas that had not previously been identified as problems by anyone in the detective bureau: She was too "fixated" on certain reports; she typed her reports instead of dictating them; she would go out into the field without her gun, which was a major safety violation;[6] and other detectives were disappointed with Zanone. The evaluation also included narrative descriptions of her performance completed by both Piper, for the first 10 months of the year, and Redmon, for the remainder of the year. Notwithstanding the almost identical descriptions of Zanone's work, although Piper had rated Zanone very good in several categories, Redmon reduced the rating in those categories to competent.[7] In addition to Sergeant Hancock, both Redmon and Piper, considered Zanone's peers even though they were lead detectives, signed the evaluation. Prior to that, Zanone had never received an evaluation that had been signed by anybody who was not in the Department's management (sergeant or higher).

---

[6] Zanone disputes this occurred except for one instance when she went to court with her gun in her briefcase.

[7] The categories included quantity of work, quality of work, work habits, personal relations and adaptability.

As 2001 progressed, Zanone continued to experience difficulties in the detective bureau. In March 2001 Zanone was practicing with a newly issued gun, which she had recently qualified to shoot, at the firing range with range master Sergeant Steve Dean. According to Zanone, the gun would not decock because the decocking mechanism was difficult to operate, a problem known to the Department. Zanone, however, was informed in a memorandum without explanation to resume use of her old gun until she was retrained. A different memorandum was placed in Zanone's personnel file, of which she was unaware at the time, stating she was unable to identify major operational components of her weapon and did not know how to decock it.

On July 18, 2001 Sergeant Hancock and Detective Redmon met with Zanone to discuss a number of items, including a directive to Zanone she should dictate her reports notwithstanding her assertion she found it easier to see patterns in the data by typing them. (Zanone was working on forgery and fraud cases that involved multiple check numbers, dates and amounts.) The supervisors also noted she had missed a detective meeting, which she stated she had not realized was taking place, and discussed the incident with her new gun. The meeting was memorialized in a memorandum to Zanone from Hancock, which she was asked to sign.

On August 28, 2001 Zanone had another meeting with Hancock and Redmon to discuss additional concerns about her performance. At the meeting Zanone was criticized because a case file she had arranged to have delivered to the district attorney's office was missing the record of the individual's arrests and convictions, as well as a supplemental report that had not yet been typed,[8] and because she had requested that the Department receptionists better screen calls to ensure that matters properly routed to dispatch were not directed to her. This meeting was also memorialized in a memorandum Zanone was asked to sign.

On December 18, 2001 Zanone met with Redmon and Sergeant Dean, who had become the sergeant in charge of the detective bureau in October 2001, to discuss new issues that had arisen: Zanone had sent duplicative requests for fingerprint analysis in the same case; she had erroneously transferred a case from Santa Fe Springs to Whittier when the bulk of the thefts had occurred in Orange County; she could not answer an informal question from her partner, Tim Roberts, regarding whether the amount constituting grand theft was $300 or $400; she was not responding quickly enough to "call-ins"; and she had too many cases rejected by the district

---

[8] Zanone testified it was not her responsibility to type the supplemental report or include the arrest record in the file.

attorney's office. Although Zanone signed the postmeeting summary memorandum as requested, she attached a written statement disputing that the memorandum accurately reflected the discussion at the meeting or that it was an accurate portrayal of her job performance.[9]

### 5. Zanone's Transfer from the Detective Bureau and Her Experience While in Patrol; the Complaint

On January 15, 2002 Zanone was informed she was being transferred back to patrol pursuant to the agreement permitting nonrenewal of an employee's special assignment without cause on the anniversary date. A few weeks after her transfer, Zanone found a "joke" memorandum had been posted above Redmon's desk at the detective bureau; Zanone believed the memorandum was mocking her. In April 2002 Zanone received her annual evaluation for 2001, which contained an overall rating of "improvement needed."

After her transfer to patrol Zanone, who was now working the night shift, began receiving "hang-up" telephone calls during the day while she was trying to sleep. She filed a police report with the City of Long Beach, where she had moved; and one of the calls was traced to the home of a Whittier sergeant who had no reason to call her. In April 2002, near in time to Zanone's receipt of her 2001 performance review, Zanone received literature on how to plan your funeral from a mortuary located on the same street as the detective bureau. Contemporaneously, Zanone began to experience problems with dispatch, which would send other officers to respond to calls in her beat area, a practice that was extremely embarrassing to her. Zanone also had difficulties with the sergeant in charge of the jail facility. As a result, Sergeant Bryant, who was again Zanone's supervisor, told her not to make any arrests until after 2:00 a.m. when that sergeant would be off duty.

Zanone began to suffer from stress, anxiety and depression. She sought treatment from a psychologist in January 2003. After diagnosing Zanone with depression, anxiety and panic disorder, the psychologist determined she was no longer capable of performing her job, and Zanone ceased working in February 2003.

---

[9] Zanone stated, "Although the memorandum is accurate regarding the issues we discussed, it does not reflect any of my comments or explanations regarding the issues. Many of the issues discussed had mitigating facts that need to be considered before passing judgment on my performance. Other issues were factually incorrect. Rather than try and respond to each individual item issue by issue, I would prefer to respond by saying I do not agree with the contents of your memorandum as it is currently written. In my opinion, rehashing each of the items on the memorandum will not be productive since it appears your decision has been made regarding my performance related to these issues. In addition, many of the issues have been previously discussed and documented with other supervisors and the re-documentation in this memorandum appears to [be] repetitive."

Zanone filed a complaint with the California Department of Fair Employment and Housing and received a right-to-sue notice. On October 29, 2003 she filed a complaint in superior court for sex discrimination, harassment and retaliation in violation of the Fair Employment and Housing Act, Government Code section 12900 et seq. (FEHA).

### 6. *The Trial*

Trial lasted 13 days with testimony from 39 witnesses, including expert witness testimony on, among other things, whether Zanone's treatment was the result of sex discrimination and retaliation or a response to legitimate workplace concerns.

### a. *Chief Singer's memorandum stating there was a perception in the Department women lacked career-enhancing futures*

Zanone introduced evidence no female sworn officer had ever been promoted to management and there was a perceived lack of opportunity for women at the Department.[10] In addition to Zanone's own testimony, Trini Nelson, who joined the Department in 1996, testified she believed she was unable to be promoted to sergeant because she was a woman; she also expressed the view the Whittier Police Department was one of the only law enforcement agencies that did not have a woman in management. Lisa Peasley, who had joined the Department in 1995 and was promoted to field training officer and then lead patrol officer, testified she left the Department in part because of her concerns about the promotion opportunities for women, a concern she had expressed to the then chief of police at the time of her departure. Additionally, after Chief David Singer, who had become chief in 2001, testified on cross-examination he did not recall ever being advised there was a perception in the Department of a lack of advantageous or career-enhancing futures for women, Zanone's counsel established Singer had made that statement in an October 25, 2002 memorandum.

### b. *Sergeant Bryant's statement Zanone was transferred from the detective bureau because she was a woman*

To support her claim she had been unfairly criticized and transferred from the detective bureau because she was a woman, Zanone called as a witness Cary Cavalieri, a special agent for the California Department of Justice, who

---

[10] Whittier did have female civilian managers, including supervisors in communications, records and support services.

testified about a background investigation he had performed in connection with Zanone's application to become a special agent for the Department of Justice in September or October 2002. Cavalieri was concerned about Zanone's transfer from the detective bureau prior to expiration of her five-year term. In an effort to determine the reason for her transfer, he interviewed Sergeant Dean and Sergeant Bryant. Over Whittier's hearsay objection, Cavalieri testified, "When I asked [Sergeant Bryant] about the circumstances surrounding [Zanone] leaving the detective bureau, he expressed—he told me that it wasn't because of a problem with [Zanone], that the problem was within—he had worked in the detective bureau, and I believe the one in Santa Fe Springs, and he felt that the reason she had problems within the bureau had to do with her being a woman." Sergeant Bryant had died before trial started and was not available to testify.

> c. *Whittier's attempt to introduce documents pertaining to the departure of two female officers from the Department and call one of those officers as a rebuttal witness*

Whittier's primary defense to Zanone's claims of discrimination, harassment and retaliation was that serious performance issues led to her transfer from the detective bureau. Whittier asserted Zanone's performance as a patrol officer, which it conceded had been outstanding, was not relevant to her performance as a detective because different skills were required for the different positions. Whittier also contended, although the Department actively recruited women, almost no qualified female officers attempted to become a sergeant. Finally, Whittier argued other women in the Department had not experienced discrimination.

Jenson testified that, in connection with her investigation of Zanone's discrimination complaint, she had looked into Zanone's contention other women had left the Department in part because of concerns about promotability. Specifically, Jenson had reviewed documents pertaining to the departure of officers Anne Marie Lunsman and Rebecca Biarnesen. As a result of her review of those materials, Jenson did not find it necessary to interview either Lunsman or Biarnesen or any other women who had left the Department. Whittier sought to introduce those documents—exit questionnaires prepared by Lunsman and Biarnesen and a summary of their exit interviews prepared by the Whittier personnel who conducted the interviews. The trial court denied Whittier's request, apparently persuaded by Zanone's argument the

documents were hearsay and did not satisfy the requirement for admission as business records notwithstanding the testimony of Whittier's human resource director, Fred Wiener, as to how the exit summaries had been prepared.

Before it had finished its defense case-in-chief, Whittier orally moved to call Lunsman as a rebuttal witness. Lunsman had not been included on its pretrial witness list, but was included on a second amended witness list filed the day jury selection commenced. Whittier contended Lunsman would testify she left Whittier solely for financial reasons and had not been treated in a discriminatory manner to rebut Zanone's and others' testimony there was Department-wide discrimination that motivated women to leave. The court ruled, if Zanone put on rebuttal witnesses and that subject was raised, Whittier could call Lunsman. Zanone did not call any rebuttal witnesses.

### 7. The Jury's Deliberations and Verdict

After four days of deliberation the jury appeared deadlocked. After seven more days of deliberation the jury reached a verdict in favor of Zanone on her claims for discrimination and retaliation by a vote of nine to three. However, the jury failed to reach a verdict on her harassment claim. Using a special verdict form prepared by Zanone, the jury awarded $1,249,165 in damages: $530,012 in economic and $372,503 in noneconomic damages on Zanone's claim for discrimination, and $59,150 in economic and $287,500 in noneconomic damages on her claim for retaliation.

### 8. The Court's Denial of the City's Motions for Judgment Notwithstanding the Verdict and for New Trial; the Award of Attorney Fees

On February 2, 2006 the court denied Whittier's motions for judgment notwithstanding the verdict and for new trial. On April 11, 2006 the trial court awarded $45,954.56 in costs and $454,803 in attorney fees to Zanone.

## CONTENTIONS

Whittier contends the trial court erred in permitting Zanone to quote from Chief Singer's memorandum, which was located in an officer's personnel file, but had not been disclosed to Zanone pursuant to the procedures specified in Evidence Code sections 1043 and 1046; admitting the hearsay statement by Sergeant Bryant that Zanone had been transferred from the detective bureau because she was a woman; failing to admit the documents pertaining to exit interviews with former officers Lunsman and Biarnesen; refusing to allow

Whittier to call Lunsman as a rebuttal witness; rejecting Whittier's special instruction defining an "adverse employment action"; and using a confusing and misleading special verdict form. Whittier further contends a juror engaged in prejudicial misconduct by researching provisions in the Penal Code during deliberations.[11]

## DISCUSSION[12]

1. *Zanone's Failure to File a* Pitchess *Motion Seeking Disclosure of Chief Singer's Memorandum Does Not Preclude Her Use of the Memorandum to Impeach the Chief's Testimony*

█ The disclosure of peace officer personnel records is governed by rules different from those for discovery of other information because, although "evidence contained in a law enforcement officer's personnel file may be relevant in a lawsuit, [that] officer 'has a strong privacy interest in his or her personnel records and . . . such records should not be disclosed unnecessarily.' " (*Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1085 [12 Cal.Rptr.3d 467]; see *People v. Mooc* (2001) 26 Cal.4th 1216, 1227 [114 Cal.Rptr.2d 482, 36 P.3d 21].) To balance these competing interests, following the Supreme Court's decision in *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305],[13] the Legislature enacted a statutory scheme mandating certain procedures for discovery of peace officer personnel records. (See *City of Santa Cruz v. Municipal Court, supra*, 49 Cal.3d at pp. 93–94 ["[i]n enacting [the statutory scheme] the Legislature clearly intended to place specific limitations and procedural safeguards on the disclosure of peace officer personnel files which had not previously been found in judicial decisions"].) Penal Code section 832.7, subdivision (a), provides "Peace officer or custodial officer personnel records and records maintained by any state or local agency pursuant to [Penal Code] Section

---

[11] Although not asserting any error in the award of costs and attorney fees to Zanone, Whittier observes those orders must be reversed if a new trial is ordered.

[12] Whittier appeals from the judgment as well as the order denying its motion for a new trial and judgment notwithstanding the verdict. While we may review orders concerning new trials for abuse of discretion, any determination underlying the order is generally reviewed under the test appropriate for that determination. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678 [24 Cal.Rptr.3d 338].)

[13] In *Pitchess v. Superior Court, supra*, 11 Cal.3d 531, the Supreme Court held a criminal defendant's fundamental right to a fair trial entitled him or her to discover relevant information in a peace officer's personnel records relating to citizen complaints. Motions for discovery of peace officer personnel files under the subsequently enacted statutory scheme are still referred to as *Pitchess* motions. (See *City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 81 [260 Cal.Rptr. 520, 776 P.2d 222]; *People v. Mooc, supra*, 26 Cal.4th at p. 1225.)

832.5 [governing citizen complaints against personnel in departments or agencies that employ peace officers], or information obtained from these records, are confidential and shall not be disclosed in any criminal or civil proceeding except by discovery pursuant to Sections 1043 and 1046 of the Evidence Code." Evidence Code sections 1043 and 1046, in turn, set forth detailed procedures for discovery and disclosure, including the requirement that, "[t]o initiate discovery, the [party seeking discovery or disclosure] must file a motion supported by affidavits showing 'good cause for the discovery,' first by demonstrating the materiality of the information to the pending litigation, and second by 'stating upon reasonable belief' that the police agency has the records or information at issue. ([Evid. Code,] § 1043, subd. (b)(3).) This two-part showing of good cause is a 'relatively low threshold for discovery.' [Citation.] [¶] If the trial court finds good cause for the discovery, it reviews the pertinent documents in chambers and discloses only that information falling within the statutorily defined standards of relevance." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 [29 Cal.Rptr.3d 2, 112 P.3d 2].)

■ Whittier contends the trial court erred by allowing Zanone to impeach Chief Singer with material from a memorandum he had written that was located in another officer's personnel file even though Zanone had not obtained the memorandum by filing a *Pitchess* motion. The memorandum at issue reported the details and conclusions of an unrelated investigation into claims of racial discrimination made by Officer James Rollins and contained Singer's statement, "There is a perception of a lack of an advantageous or career-enhanced future for minority or female officers within the WPD." Because this memorandum does not fall within the statutory definition of "personnel records," even if it could be found in Officer Rollins's personnel file, the trial court did not err in allowing its use to impeach Singer.[14]

■ Penal Code section 832.8 defines peace officer personnel records as "any file maintained under that individual's name by his or her employing agency and containing records relating to any of" a list of enumerated categories of information, including personal data, medical history and

---

[14] Because we conclude Chief Singer's memorandum does not fall within the scope of the protective procedures enacted for discovery of peace officer personnel files, we need not address the intriguing—and apparently unresolved—question whether a party that legitimately obtains personnel records subject to such protection without first filing a *Pitchess* motion (for example, by receiving copies from the involved officer) is nonetheless precluded from offering that information into evidence or using it in cross-examination: that is, whether the *Pitchess* procedures affect not only discovery of personnel information but also its admissibility. (See generally *Michael v. Gates* (1995) 38 Cal.App.4th 737, 743 [45 Cal.Rptr.2d 163] [observing, in dictum, the *Pitchess* statutes protect peace officers' privacy rights "by requiring a noticed motion, in camera hearing, and court order before [the officer's] records could be introduced or otherwsie used in any litigation"].)

employee discipline. (Pen. Code, § 832.8, subds. (a), (b), (d).)[15] Last year, in *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 293 [64 Cal.Rptr.3d 661, 165 P.3d 462] (*POST*) the Supreme Court held only information falling into one of Penal Code section 832.8's specifically listed categories is a "personnel record" subject to the *Pitchess* procedure; other information that may be physically located in the personnel file is not a "personnel record" for *Pitchess* purposes: "To extend the statute's protection to information not included within any of the enumerated categories merely because that information is contained in a file that also includes the type of confidential information specified in the statute would serve no legitimate purpose and would lead to arbitrary results. Therefore, we conclude that peace officer personnel records include only the types of information enumerated in [Penal Code] section 832.8." (*POST*, at p. 293.) Accordingly, the issue is whether the Singer memorandum concerning the Rollins racial discrimination complaint falls within one of the specific categories of information listed in Penal Code section 832.8's definition.

Whittier contends Chief Singer's October 25, 2002 memorandum falls within the ambit of Penal Code section 832.8, subdivision (e), which lists "[c]omplaints, or investigations of complaints, concerning an event or transaction in which [the peace officer] participated, or which he or she perceived, and pertaining to the manner in which he or she performed his or her duties." Whittier argues the investigation of Rollins's complaint of racial discrimination, the subject of the memorandum, was based on events Rollins had perceived—that is, his own discriminatory treatment by other members of the Department.

■ Whittier's proposed construction of Penal Code section 832.8, subdivision (e), ignores critical, limiting statutory language.[16] While it is correct a

---

[15] Penal Code section 832.8 provides, "As used in Section 832.7, 'personnel records' means any file maintained under that individual's name by his or her employing agency and containing records relating to any of the following: [¶] (a) Personal data, including marital status, family members, educational and employment history, home addresses, or similar information. [¶] (b) Medical history. [¶] (c) Election of employee benefits. [¶] (d) Employee advancement, appraisal, or discipline. [¶] (e) Complaints, or investigations of complaints, concerning an event or transaction in which he or she participated, or which he or she perceived, and pertaining to the manner in which he or she performed his or her duties. [¶] (f) Any other information the disclosure of which would constitute an unwarranted invasion of personal privacy."

[16] Questions of statutory interpretation are questions of law subject to our independent or de novo review. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]; see *California Veterinary Medical Assn. v. City of West Hollywood* (2007) 152 Cal.App.4th 536, 546 [61 Cal.Rptr.3d 318].) "[W]e must attempt to effectuate the probable intent of the Legislature, as expressed through the actual words of the statutes in question. [Citations.] ' "Our first step [in determining the Legislature's intent] is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning.

personal record includes information relating to the investigation of a complaint, not just the complaint itself, and may concern events or transactions the officer perceived, as well as those in which he or she actually participated, only those complaints or investigations of complaints that also "pertain[] to the manner in which [the officer] performed his or her duties" are included within subdivision (e)'s definition of personnel records. That is, to be a personnel record the complaint or investigation of a complaint must both concern an event that involved the officer as a participant or witness *and* pertain to the officer's performance of his or her duties. (See *Melamed v. City of Long Beach* (1993) 15 Cal.App.4th 70, 79 [18 Cal.Rptr.2d 729] ["[o]rdinarily, the word 'and' connotes a conjunctive meaning, while the word 'or' implies a disjunctive or alternative meaning"].)

Whittier's alternative interpretation, applying the "pertaining to" condition only to events in which the officer participated, not those he or she perceived, based on the placement of commas after "participation" and before "perceived," not only contradicts the plain meaning of the statute and established rules of statutory construction[17] but also is at odds with the evident legislative intent and commonsense: Records relating to complaints concerning an

[Citations.]" [Citation.]' " (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990 [73 Cal.Rptr.2d 682, 953 P.2d 858].) "If the statutory language is unambiguous, 'we presume the Legislature meant what it said, and the plain meaning of the statute governs.' " (*People v. Toney* (2004) 32 Cal.4th 228, 232 [8 Cal.Rptr.3d 577, 82 P.3d 778]; see *People v. Loeun* (1997) 17 Cal.4th 1, 9 [69 Cal.Rptr.2d 776, 947 P.2d 1313] [" '[i]n interpreting statutes, we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law' "].) "While punctuation and grammar should be considered in interpreting a statute, neither is controlling unless the result is in harmony with the clearly expressed intent of the Legislature." (*In re John S.* (2001) 88 Cal.App.4th 1140, 1144, fn. 1 [106 Cal.Rptr.2d 476].) Moreover, statutes are not to be read in isolation, but construed in context and " 'with reference to the whole system of law of which [they are] part so that all may be harmonized and have effect.' " (*Landrum v. Superior Court* (1981) 30 Cal.3d 1, 14 [177 Cal.Rptr. 325, 634 P.2d 352].)

[17] Whittier's parsing of the words and punctuation used in Penal Code section 832.8, subdivision (e), is severely flawed. Applying the last antecedent rule, if the statutory requirement that the complaint or investigation of the complaint pertain to the manner in which the officer performed his or her duties were to be limited at all, it would apply only to events perceived by the officer, not those in which the officer actually participated. (See *White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191] [" 'last antecedent rule' " provides, in general, that " 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote' "]; *Costco Wholesale Corp. v. Workers' Comp. Appeals Bd.* (2007) 151 Cal.App.4th 148, 154 [59 Cal.Rptr.3d 611] [same].) However, under general rules of statutory construction, the use of a comma before the gerund phrase "and pertaining to the manner in which he or she performed his or her duties," indicates a legislative intent to apply that limitation to both antecedents, not solely to either the immediately preceding or the more distant one. (See *White*, at p. 680 ["[e]vidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma"]; see also *Garcetti v. Superior Court* (2000) 85 Cal.App.4th 1113, 1120 [102 Cal.Rptr.2d 703].)

event an officer merely witnessed would be afforded greater confidentiality than records involving a complaint about an event in which the officer participated. Yet it is those officers who have been the subject of complaints about their alleged misconduct whose privacy rights are most threatened by overly broad disclosure of personnel records and who, therefore, need the greater protection afforded by the statutory scheme. (See generally *People v. Mooc, supra*, 26 Cal.4th at p. 1227; *City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 53 [19 Cal.Rptr.2d 73, 850 P.2d 621].)

### 2. Any Error in Admitting Sergeant Bryant's Statement Zanone Was Transferred from the Detective Bureau Because She Was a Woman Was Harmless

Agent Cavalieri's testimony regarding Sergeant Bryant's statement to him about Zanone's transfer from the detective bureau was, without question, hearsay. (See Evid. Code, § 1200.) Although we agree with Whittier's assertion Bryant's statement did not fall within any exception to the hearsay rule and, therefore, was not properly admitted, in light of the other evidence of discrimination and retaliation before the jury, any error was harmless.

a., b.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 3. The Trial Court Did Not Abuse Its Discretion in Excluding the Exit Questionnaires and Exit Interview Summaries

Whittier contends the trial court erred in refusing to admit the exit questionnaires prepared by departing officers Lunsman and Biarnesen, as well as summaries of the exit interviews prepared by the Whittier personnel who conducted them. The trial court's ruling was well within its discretion,[21] notwithstanding its comment at the hearing on Whittier's motion for new trial that it would "probably change [its] ruling" because "[i]t does appear that they may have been business records."

#### a. Governing law

■ Evidence Code section 1271 provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the

---

*See footnote, *ante*, page 174.

[21] We review the exclusion of hearsay evidence on the ground it does not qualify for admission as a business record for abuse of discretion. (*Exclusive Florists, Inc. v. Kahn* (1971) 17 Cal.App.3d 711, 716 [95 Cal.Rptr. 325] ["[i]n determining whether a writing meets the requirements of a business record the trial judge is vested with broad discretion the exercise of which, absent a showing of abuse, will not be disturbed on appeal"].)

hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." As the Law Revision Commission comment to Evidence Code section 1271 explains, " 'The chief foundation of the special reliability of business records is the requirement that they must be based upon the first-hand observation of someone whose job it is to know the facts recorded. . . . But if the evidence in the particular case discloses that the record was not based upon the report of an informant having the business duty to observe and report, then the record is not admissible under this exception, to show the truth of the matter reported to the recorder.' [Citations.] [¶] Applying this standard, the cases have rejected a variety of business records on the ground that they were not based on the personal knowledge of the recorder or of someone with a business duty to report to the recorder. Police accident and arrest reports are usually held inadmissible because they are based on the narrations of persons who have no business duty to report to the police. [Citations.] They are admissible, however, to prove the fact of the arrest." (Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1271, pp. 315–316.)

b. *The exit questionnaires are not business records*

The record on appeal does not demonstrate the exit questionnaires met the criteria for business records. Although it may have been Whittier's practice to require departing employees to complete the exit questionnaire and to keep those questionnaires with the exit interview summaries prepared by Whittier personnel, to qualify as a business record the document's *author* must have created the document in the ordinary course of his or her business. (*Daniels v. Department of Motor Vehicles* (1983) 33 Cal.3d 532, 537–538 [189 Cal.Rptr. 512, 658 P.2d 1313] [accident report submitted to Department of Motor Vehicles by vehicle owner pursuant to Vehicle Code was not business record; "[a]lthough it may be the regular course of business for the D.M.V. to receive the report, it undoubtedly is not in the regular course of business for the citizen author to make . . . such a report. And, it is this aspect of the report that bears on the trustworthiness factor contemplated by this exception to the hearsay rule"].) Clearly, the departing officers were neither employees acting on behalf of the Department nor acting in the ordinary course of their own business when they completed their exit questionnaires, an infrequent event. Moreover, because the two officers in this case were leaving to join other police departments, their exit questionnaires were not inherently trustworthy.

The officers could have easily believed any complaints they may have made about sex discrimination—or anything less than a glowing endorsement of the Department and its personnel—would be communicated to their new employers and cause them to suffer adverse treatment as a result.

### c. *The summaries are not business records*

The exit interview summaries prepared by Whittier employees, although prepared in the ordinary course of business, also do not qualify as business records under Evidence Code section 1271 because the employees who prepared them did not have firsthand knowledge of the events recorded and the officers, who did have firsthand knowledge, were not under a business duty to accurately report the facts pertaining to their departure. (See *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 126 [52 Cal.Rptr. 561, 416 P.2d 793] ["business records are not admissible under this exception when they are 'not based upon the report of an informant having the business duty to observe and report' "]; Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code, *supra,* at p. 315.) Moreover, the summaries, even if they had been established as business records, themselves contained hearsay statements regarding the employees reasons for leaving for which no exception had been established. (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1205 [122 Cal.Rptr.2d 890] ["[w]hen multiple hearsay is offered, an exception for *each* level of hearsay must be found in order for the evidence to be admissible"]; *People v. Ayers* (2005) 125 Cal.App.4th 988, 995 [23 Cal.Rptr.3d 242] [same]; Evid. Code, § 1201 ["statement within the scope of an exception to the hearsay rule is not inadmissible on the ground that the evidence of such statement is hearsay evidence if such hearsay evidence consists of one or more statements each of which meets the requirements of an exception to the hearsay rule"].) Inasmuch as the exit questionnaires prepared by the departing employees lacked trustworthiness, the summaries, which repeated much of the same information, were equally lacking in trustworthiness. A summary of an inadmissible hearsay statement cannot be made admissible merely because it is repeated in a valid business record.

4.–7.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante,* page 174.

## DISPOSITION

The judgment is affirmed. Zanone is to recover her costs on appeal.

Zelon, J., and Wiley, J.,[*] concurring.

Appellant's petition for review by the Supreme Court was denied July 23, 2008, S164038.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.