Filed 11/24/21  HMH Enterprises v. TAG Enterprises CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HMH ENTERPRISES, INC., et al., | B303640 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC694539) |
| v. | |
| TAG ENTERPRISES, LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elizabeth Allen White, Judge.  Affirmed.

Renshaw & Associates, Steven J. Renshaw and Lee A. Hess; Lipow & Harris and Jeffrey A. Lipow, for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, Scott Sveslosky and Sarah A. K. Blitz for Defendant and Respondent.

————————————

## INTRODUCTION

Plaintiffs HMH Enterprises Inc., Hekmat Popal, Masih Rassoli, and Yosuf Mohammad Homayun appeal following judgment in favor of defendant TAG Enterprises LLC. Plaintiffs contend the trial court erred in granting two of defendant's motions in limine to exclude evidence of plaintiffs' damages. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

The lawsuit concerns the contemplated sale of a laundromat business located in a shopping center in Cudahy, California. Defendant TAG (sometimes referred to as landlord) owns the Cudahy shopping center. Ji Hong Min (who is not a party to the lawsuit) was a tenant of TAG's who owned and sought to sell the laundromat business. Plaintiffs were interested buyers.

### 1.    *Attempted Sale of the Laundromat*

In March 2017, shortly after the laundromat's opening, its 24-hour operations began attracting "homeless [people], gang members, and loiterers to the Cudahy Property in the evening hours, causing extensive safety and health concerns for tenants, vendors, and visitors." TAG, as landlord, asserted that the terms of the lease agreement prohibited such activity on the property. TAG informed tenant Min about the complaints and safety issues, and demanded he either hire security services to address the ongoing problems, or reduce the overnight operating hours. Min refused to do either, and instead decided to sell the business. Under the lease, any assignment required TAG's approval, but TAG could not unreasonably withhold consent.

Min subsequently entered into a contract with plaintiffs to sell the laundromat business for $2.2 million dollars. The agreement was conditioned on TAG's assignment of the lease. In September 2017, TAG's property manager was introduced to

2

plaintiffs as prospective purchasers.  The property manager told plaintiffs of the ongoing health and safety issues caused by the laundromat's overnight operations, and reiterated the same solutions proposed to Min – reduce operating hours or obtain security services at night.  Plaintiffs then asked Min to reduce the purchase price to account for the added costs of security.  Min refused, and in November 2017, plaintiffs chose to walk away from the proposed purchase.[1]  One month later, plaintiffs bought a laundromat in Culver City, California.

## 2.     *Plaintiffs' Lawsuit*

On February 16, 2018, plaintiffs filed a complaint against TAG and its individual owners for intentional interference with contract and discrimination in business dealings.  By July 26, 2019, plaintiffs had dismissed the discrimination claim against TAG and all causes of action against the individual defendants.  The court had also granted TAG's motion for summary adjudication of the punitive damages claim.  This left a single cause of action against TAG for economic damages based on interference with contract.

To prove compensatory damages, plaintiffs retained Samuel Biggs, a certified public accountant and litigation consultant.  Biggs expressed the opinion that plaintiffs had lost $6,966,517 in projected profits for the laundromat business which they were unable to purchase.  To support his damages calculations, Biggs intended to rely at trial primarily on what was marked as Exhibit 10 — a document authored by tenant Min and titled "the Cudahy Breakdown."  The Cudahy Breakdown purported to show the laundromat's average monthly profit.

---

[1]     In April 2018, shortly after this lawsuit was filed, Min sold his laundromat to a buyer who elected to employ security services at the laundromat from 11:00 p.m. to 5:00 a.m.

Biggs himself had prepared a different document, Exhibit 3, which showed the laundromat's projected income and losses over the course of 21 years.  Plaintiffs' theory was that the lease, which had 11 years remaining and included two five-year renewal options, provided for a 21-year rental period.  Under the lease, the tenant could opt to renew if not in default.  The rent for the two five-year options was to be agreed upon by TAG and the tenant.

### 3.    *TAG's Motions in Limine*

The court scheduled trial for September 16, 2019.  On August 15, 2019, TAG filed three motions in limine.  The trial court's order granting two of the motions – "Motion in Limine No. 1 To Exclude The Expert Opinion Testimony of Samuel Biggs," and "Motion in Limine No. 2 To Exclude 'Cudahy Breakdown' Document" – form the basis of plaintiffs' appeal.

In Motion in Limine No. 1, TAG argued that Biggs's testimony was "inherently unreliable and untrustworthy . . . because it is based on unverified and admittedly inaccurate data."  TAG asserted that "Biggs arrives at his nearly $7 million [damages] figure by simply adopting the numbers that Plaintiffs provided to him without performing *any* testing or independent verification."  TAG explained that Biggs testified he relied entirely on the Cudahy Breakdown to determine a monthly profit, and "annualized it to come up with $800,000 in lost profits for 2018.  Biggs then added a 1.5 [percent] escalation rate, year over  year, *for 21 years*, to derive a gross revenue figure.  He then took the expenses listed on Exhibit 10, extrapolated out those expenses over a 21[-]year period, and deducted it from the gross revenues to arrive at a net profit amount."  TAG argued that Biggs's opinion assumed the financial data in the Cudahy Breakdown was true despite the fact that Min, who had prepared the document, admitted the data was not accurate.  TAG pointed

4

out that the total projected annual *profit* was substantially greater than the *income* Min had reported on the laundromat's recent tax returns and financial statements. TAG argued that for Biggs's testimony to be admissible, Biggs was required to verify the data. His failure to do so made his projections speculative and, hence, inadmissible.

TAG continued that Biggs's "methodology for inventing the $7 million damages figure is equally flawed. Biggs speculates that Plaintiffs would have operated the laundromat *for 21 years* despite the fact that (1) Plaintiffs had minimal experience in the laundromat business and (2) there was no guarantee that TAG would renew the lease."[2] TAG also claimed that (1) Biggs applied a 1.5 percent sales escalation rate based on general inflation—not one tied to the laundromat industry; and (2) that his valuation of the business at $1.4 million in 21 years assumed the landlord would agree to renew the lease at the end of the 21-year period. Lastly, TAG argued that Biggs failed to reduce the damages by the $550,000 down payment plaintiffs would have made if they had purchased the laundromat business. Biggs appeared to have admitted this error in his deposition.

In Motion in Limine No. 2, TAG asserted that the Cudahy Breakdown was hearsay not within any exception, was an impermissible summary of voluminous documents that were never produced, and was unreliable and untrustworthy.

Tenant Min created the Cudahy Breakdown and admitted during his deposition that it " 'shows a monthly average. And it's not the official money in and out of the bank. It's just cash in and

---

[2]     Because plaintiffs owned the option to renew the lease, we assume that TAG's argument was actually that the parties might not agree upon the rent for the option periods, and hence the lease would not be extended beyond the original 11 years.

5

out. These are just rough numbers.' " (Emphasis omitted.) Min stated that there was "a revised one and the numbers are much lower. I was a little confused with the one for the prior buyer. This is the correct one for this buyer." On the document, the total income is circled in pen and an adjacent hand-written note reads: "different from the original, because seller put more coins in the store." TAG asserted the document lacked the hallmarks of a business record because (1) it was created for the purpose of selling the laundromat to plaintiffs; and (2) plaintiffs had not produced the underlying documents on which the Cudahy Breakdown was based.

4. ***Plaintiffs' Opposition to the Motions in Limine***

In response to Motion No. 1, plaintiffs claimed that "while Mr. Biggs did not personally analyze and verify the data provided by Mr. Min in Exhibit 10, he relied on the verification thereof by Plaintiffs" and by Eastern Funding, plaintiffs' lender. Plaintiffs pointed out that they had counted coins three days per week for several weeks to verify the laundromat's income. Plaintiff explained that they "applied for financing from Eastern Funding, a lender specializing in the purchasing [of] laundromats in Southern California and in other markets across the country. Eastern Funding conducted its own due diligence into Mr. Min's business, reviewing the utility bills and communicating with Plaintiffs about the coin counts. Eastern Funding ultimately prepared its own income and expense projections for the business and based thereon approved a loan for $1.6 million to Plaintiffs to purchase Mr. Min's business."

In opposing Motion No. 2, plaintiffs argued that the Cudahy Breakdown was admissible as a business record, prepared by Min in the ordinary course of business when he was in the process of selling the business to plaintiffs. Plaintiffs echoed arguments made in response to the first motion in limine

6

regarding how they verified the accuracy of the Cudahy Breakdown with coin counts and utility bills. Plaintiffs also asserted that their lender, Eastern Funding, "did an analysis of Mr. Min's business to verify the numbers in the Cudahy breakdown as accurate." Plaintiffs argued that "an expert may testify to otherwise inadmissible hearsay used as the basis in their opinion."

## 5. *TAG's Reply*

In reply, TAG argued, "It is wholly irrelevant whether Plaintiffs or Eastern Funding relied upon Exhibit 10 [the Cudahy Breakdown] for their respective purposes. Biggs'[s] adoption of the numbers in Exhibit 10 at 'face value' without any independent verification or analysis of their accuracy, while ignoring evidence to the contrary [Min's tax returns], renders his opinion inadmissible." TAG pointed out that "Biggs did not know who created Exhibit 10, where the data on Exhibit 10 came from, how the data for Exhibit 10 was created, or why Exhibit 10 was created."[3] TAG emphasized that plaintiffs conceded Eastern

---

[3] Biggs testified at deposition: "I don't know specifically who prepared [the Cudahy Breakdown], but this was provided to us as a -- as the financing of -- the loan request, the basis for the loan request that the Plaintiffs had prepared and the financial institution had approved." Biggs later testified the top line (which showed total sales) in the Cudahy Breakdown was based on plaintiffs' coin counts. Defense counsel then informed Biggs that plaintiffs did not prepare the Cudahy Breakdown and that it was actually prepared by Min. Biggs stated "You're telling me that [the Cudahy Breakdown] was prepared by the -- by the seller? [¶] . . . [¶] Okay. I was not aware of that. What was represented to me -- or my belief was that this first of all, was the financial statement that the Plaintiffs used and -- and believed to be accurate, and that's what they were buying the business on. [¶] So, if the seller prepared this and they believed it to be

Funding did not rely on the Cudahy Breakdown, but instead used utility bills and "plaintiff's coin counts (which were not documented) when preparing Eastern Funding's 'own income and expense projections.' "

TAG reiterated that the Cudahy Breakdown did not qualify as a business record, because there was "insufficient evidence of record keeping practices, the manner in which the Cudahy Breakdown was prepared, and the sources of information for the Cudahy Breakdown to support a finding of reliability. . . . [T]he author of the Cudahy Breakdown [testified] throughout his deposition that the Cudahy Breakdown is just 'rough' numbers and 'not the official' numbers." The "official" numbers, i.e., tax returns, showed the laundromat's profits were several hundred thousand dollars less than that reported in the Cudahy Breakdown.

**6.**    ***The Section 402 Hearing***

On September 23, 2019, the trial court held an Evidence Code section 402 hearing on the two motions. Biggs testified that he prepared a profit and loss statement with escalation projections marked as Exhibit 3 based upon the numbers in the Cudahy Breakdown. Biggs projected that plaintiffs lost a net profit of $6,966,517 by not being able to purchase and operate the laundromat. He reached this total by subtracting projected operating expenses from projected annual sales over a 21-year period—from 2018 through 2039. Specifically, the Cudahy Breakdown showed a monthly gross sales figure of $73,120, which Biggs annualized to come up with $880,000 in lost sales for 2018. He then added a 1.5 percent inflation escalation rate (not

---

accurate based on their -- their coin counts and their review of the business, then I'll accept the fact that they believed that -- that this was accurate on that basis."

8

one tied to the laundromat business), and applied it year over year, for 21 years. Biggs deducted year-long operating expenses to generate his projections for the annual profits.[4]

Biggs also testified he had relied on plaintiffs' statement that the numbers in the Cudahy Breakdown were accurate, and stated it was beyond the scope of his assignment to check the veracity of those figures. Biggs did not review general ledgers, utility bills, or any information regarding coin counts. Biggs did not know who prepared the Cudahy Breakdown at the time he made the projected profit estimate or at the time of his deposition. Biggs acknowledged that he disregarded the handwritten notation on the Cudahy Breakdown that stated that the financial figures were "different from the original," "[b]ecause seller put more coins in the store."

Biggs testified that he reviewed the laundromat's historical financial statements and tax records, but gave little credence to them because based on his professional experience, he found cash businesses generally understated their sales figures to reduce tax exposure. For instance, using the financials and tax records, Biggs calculated the 2017 income to be just under $600,000. Yet, in exhibit 3, relying on the Cudahy Breakdown and not the tax returns or the financial statements, Biggs estimated plaintiffs' projected total 2018 sales to be $880,000—which was $280,000 more than the seller had reported in the previous year.

Biggs testified that although plaintiffs did not create the Cudahy Breakdown, he could rely on the document because plaintiffs represented that the Cudahy Breakdown was accurate. He relied on the nine to 12 days of coin counting plaintiffs

---

[4]    Biggs identified $578,974 as 2018's operating expenses. He projected loan payments to end in 2025. Biggs also deducted $85,000 in annual depreciation.

conducted during escrow.  Biggs did not know the total coin count, the standards plaintiffs employed during the count, the methodology plaintiffs used to count coins, or any other information about the counts.  He also had never seen documentation of the coin count.

Biggs testified that he assumed plaintiffs would operate the business for 21 years, despite acknowledging that plaintiffs were new to the business, could wind up in default on the lease, and could sell the business at any time.  Biggs admitted he utilized a 1.5 percent escalation rate untethered to the laundromat industry.  He neither considered local competition nor did he conduct a market survey.  Biggs failed to deduct from his lost profit analysis the $550,000 down payment that plaintiffs were required to make if they had purchased the laundromat.  Biggs also assumed the laundromat would have a residual value of $1.4 million after 21 years, despite not knowing whether the parties would agree to renew the lease after 21 years.

## 7.     *The Court's Ruling*

On September 24, 2019, the trial court by minute order granted TAG's motions in limine.  The court ruled that under Evidence Code section 801, subdivision (b) and *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*), Biggs's expert opinion testimony was inadmissible as a matter of law, because it was not based on matters "of a type that reasonably may be relied upon by an expert in forming an opinion."[5]  The trial court further found

---

[5]     Evidence Code section 801, subdivision (b) provides:  "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:  [¶] . . . [¶]  (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether

10

that: "[T]he Cudahy Breakdown is the only document on which Biggs relied to establish lost profits. Biggs has acknowledged that he did nothing to verify the numbers and acknowledged that Min had testified that the document was 'unofficial.' As such, the pro forma projections, Ex. 3, cannot be relied on. Likewise, Ex. 10 [the Cudahy Breakdown] has no basis in reality as Min has acknowledged it as being unofficial and 'different from the original.' "

### 8.   *Entry of Judgment*

Following the trial court's ruling, plaintiffs and TAG submitted to the court a proposed order on consent to judgment, which the trial court signed and filed on October 21, 2019. That order stated that as a result of the trial court's in limine orders, plaintiffs "are unable to introduce into evidence any damages at trial, and unable to prove an essential element of their claim for Intentional Interference with Contract." The order acknowledged that the parties consented to the judgment in TAG's favor, but that plaintiffs intended to appeal the court's in limine orders.

On November 19, 2020, the trial court entered judgment in TAG's favor. Plaintiffs filed a timely notice of appeal.

## *DISCUSSION*

Plaintiffs argue that the court erred in sustaining the motions in limine which had the effect of excluding the Cudahy Breakdown and Biggs's testimony.

### 1.   *Standard of Review*

Although it is well-established that we review evidentiary rulings for an abuse of discretion (see *Sargon, supra*, 55 Cal.4th

---

or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

11

at p. 773; *LAOSD Asbestos Cases* (2020) 44 Cal.App.5th 475, 485;), plaintiffs argue we should review the ruling de novo because exclusion of the evidence was tantamount to a grant of nonsuit. Plaintiffs cite *Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1279 (*Kinda*).

In *Kinda*, defendants moved in limine to exclude posts made on Yelp.com as unauthenticated. Plaintiffs responded that the posts could be authenticated under Evidence Code section 1552 (self-authenticating exhibits). (*Kinda, supra*, 247 Cal.App.4th at p. 1283.) In its ruling, "the trial court rejected Evidence Code section 1552 and plaintiffs' proffer as a basis for authenticating the Yelp reviews, explaining its concern was not whether the Yelp posts could be authenticated under section 1552 as writings that existed on the Internet under an alias, but whether the evidence would be sufficient to prove [plaintiffs'] defamation claim." (*Id*. at p. 1285.) The appellate court explained that the trial court treated "the motion in limine like a motion for nonsuit, rather than limiting its assessment to the initial question of whether the documents were sufficient for the 'trier of fact to find that the writing is what it purports to be.' " (*Ibid*.) The court explained that when in limine proceedings are used to foreclose a cause of action, the ruling is subject to de novo review, as though the court had granted a motion for nonsuit. (*Id*. at p. 1279.) We do not find *Kinda* helpful.

"In limine motions are designed to facilitate the management of a case, generally by deciding difficult evidentiary issues in advance of trial. ' "The usual purpose of motions in limine is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party. A typical order in limine excludes the challenged evidence and directs counsel, parties, and witnesses not to refer to the excluded matters during trial. [Citation.] 'The advantage of such motions is to avoid the

12

obviously futile attempt to "unring the bell" in the event a motion to strike is granted in the proceedings before the jury.' [Citation.]" ' [Citation.] What in limine motions are not designed to do is to replace the dispositive motions prescribed by the Code of Civil Procedure." (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1593, emphasis omitted.) Dispositive motions include "summary judgment, directed verdict, nonsuit, [and] judgment before presentation of defense evidence." (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 856.)

In the present case, the trial court did not turn the in limine proceeding into a motion for nonsuit. Typical of many in limine proceedings, the trial court ruled on the admissibility of specific evidence, here expert testimony and a single document. The court did not preclude plaintiffs from introducing all evidence of damages. It turned out that plaintiffs had no evidence once the expert testimony and challenged document were excluded, and plaintiffs decided not to go forward.

The trial court did not expressly or impliedly grant a nonsuit– it ruled on the admissibility of evidence. Accordingly, we review the exclusion of that evidence under the abuse of discretion standard. (*Sargon, supra*, 55 Cal.4th at p. 773; *LAOSD Asbestos Cases, supra*, 44 Cal.App.5th at p. 485.)

2. ***The Court Did Not Abuse Its Discretion in Excluding the Cudahy Breakdown***

We begin our review by addressing the court's exclusion of the Cudahy Breakdown for the reason that Biggs's testimony was based entirely on that exhibit. In *People v. Sanchez* (2016) 63 Cal.4th 665, 684, our Supreme Court held that, "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like

13

any other hearsay evidence, it must be properly admitted through an applicable hearsay exception."  Here, plaintiffs assert that the Cudahy Breakdown was admissible as a business record or "as a general compilation of documents."  According to that argument, the Cudahy Breakdown was admissible and Biggs could properly give expert testimony based on a document admitted into evidence.

### a.     Business Record Exception

Evidence Code section 1271 provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:  [¶]  (a) The writing was made in the regular course of a business; [¶]  (b) The writing was made at or near the time of the act, condition, or event; [¶]  (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶]  (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."  (See *Zanone v. City of Whittier* (2008) 162 Cal.App.4th 174, 191.)

Made in the "regular course of business" means the "writing must be of a type *customarily kept* by the 'business' involved—i.e., it must appear that the business *routinely* makes a record of the act, condition or event in question as part of its *regularly-conducted* business activities."  (Wegner et al., Cal. Practice Guide:  Civil Trials & Evidence (The Rutter Group 2020) Ch. 8D-D, ¶ 8:1617.)

"Whether a particular business record is admissible as an exception to the hearsay rule . . . depends upon the trustworthiness of such evidence, a determination that must be made, case by case, from the circumstances surrounding the making of the record.  The foundation for admitting the record is properly laid if in the opinion of the court, the sources of

14

information, method and time of preparation were such as to justify its admission." (*People v. Zavala* (2013) 216 Cal.App.4th 242, 246 [citation and internal quotation marks omitted].) "The trial court has wide discretion to determine whether there is a sufficient foundation to qualify evidence as a business record; we will overturn its decision to admit such records only upon a clear showing of abuse." (*Conservatorship of S.A.* (2018) 25 Cal.App.5th 438, 447.)

Based on the evidence at the Evidence Code section 402 hearing, the trial court did not abuse its discretion in concluding the Cudahy Breakdown was neither trustworthy nor made in the regular course of business. Plaintiffs provided no evidence explaining how the document was prepared or the origin of the raw numbers. When questioned at his deposition, Min essentially debunked that the Cudahy Breakdown was a business record by testifying: "It shows a monthly average. And it's not the official money in and out of the bank. It's just cash in and out. These are just rough numbers." Min explained, "there is a revised one and the numbers are much lower. I was a little confused with the one for the prior buyer. This is the correct one for this buyer." Min's testimony was that he prepared the document in anticipation of selling the business to a particular buyer, and not as part of a business routine or regular act. The trial court reasonably found significant that adjacent to the total income, which is circled on the Cudahy Breakdown, there was an unexplained handwritten note from an unidentified person, stating "different from the original, because seller put more coins in the store."

The trial court could reasonably have interpreted Min's testimony to mean that Min inflated the income in preparing the accounting for plaintiffs, and could have found that the numbers in the Cudahy Breakdown were untrustworthy. As the court

15

bluntly put it: "Likewise, Ex. 10 [the Cudahy Breakdown] has no basis in reality as Min has acknowledged it as being unofficial and 'different from the original.' "

Separately, the trial court's ruling is supported by plaintiffs' failure to produce documentation supporting Min's "rough numbers." Biggs testified: "I asked if there were any general ledgers and other documents that there might – might exist for the business, but none – none existed." "The bottom line foundational requirement is that the 'sources of information and method and time of preparation [of the record] were *such as to indicate its trustworthiness.*' " (Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2020) Ch. 8D-D, ¶ 8:1644 (emphasis in original).) The absence of the laundromat's ledgers and accurate documentation of income were other indices that the Cudahy Breakdown was unreliable hearsay and not admissible.

To the extent plaintiffs claim their lender, Eastern Funding, "did an analysis of Mr. Min's business to verify the numbers in the Cudahy breakdown as accurate," there was no evidence that the lender participated in the preparation of the Cudahy Breakdown. The trial court could have reasonably found that Eastern Funding's independent evaluation of the numbers did not show that the sources of information and method and time of preparation demonstrated the trustworthiness of the Cudahy Breakdown.

The court did not abuse its discretion in finding that the Cudahy Breakdown was not a business record.

### b. Summary of Voluminous Records Exception

Alternatively, plaintiffs contend that the Cudahy Breakdown was admissible as a compilation of voluminous records, citing *Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 293 (*Heaps*). First, we observe that plaintiffs did not make this

16

argument in the trial court.  Plaintiffs' failure to raise this issue below forfeits it on appeal.  (*Wood v. Santa Monica Escrow Co.* (2007) 151 Cal.App.4th 1186, 1192.)

Second, plaintiffs cite *Heaps* for the principle that a summary of voluminous records is admissible where the original records "could not be examined individually by the court without great loss of time."  (*Heaps, supra*, 124 Cal.App.4th at p. 293.) Plaintiffs provided no evidence that a year's worth of monthly income and loss statements from 2017 would be too numerous for the trial court or jury to review.  Plaintiffs' voluminous records exception simply does not pass muster.

**3.    *The Court Did Not Abuse its Discretion in Excluding Biggs's Testimony***

In *Sargon*, the California Supreme Court explained that "under Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion. . . . '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors. . . .  [¶]  Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony:  will the testimony assist the trier of fact to evaluate the issues it must decide?" ' "  (*Sargon, supra*, 55 Cal.4th at p. 770.)

Here, Biggs's entire opinion was based on what the trial court correctly determined was inadmissible hearsay—the Cudahy Breakdown.  That document's exclusion eliminated the "evidentiary support" for Biggs's profit and loss projections. Biggs provided no other foundation for the numbers he used in making such projections, instead testifying that it was outside the scope of his employment to verify the laundromat's income and expenses.  Therefore, the trial court did not err in finding

17

Biggs's testimony speculative and inadmissible under *Sargon* and Evidence Code section 801.

Plaintiff also argues that, "the information contained within Ex.10 could have been derived from seller on the stand." Perhaps true in theory, but that is belied by what happened at Min's deposition. Min's testimony that the Cudahy Breakdown contained "just rough numbers" negated the accuracy of the information. Neither at the Evidence Code section 402 hearing nor in the opposition papers, did plaintiffs offer additional testimony from Min describing the factual basis for the numbers contained in the Cudahy Breakdown.

## *DISPOSITION*

The judgment is affirmed. Respondent TAG Enterprises, LLC shall recover its costs on appeal.

RUBIN, P.J.

WE CONCUR:

BAKER, J.

KIM, J.

18