173 Cal.App.4th 883 (2009)
___ Cal.Rptr.3d ___
Conservatorship of the Person and Estate of THOMAS LEE EDDE.
STATE DEPARTMENT OF DEVELOPMENTAL SERVICES, Petitioner and Appellant,
v.
KRIS GRASTY, as Public Guardian, etc., Objector and Respondent;
JOHN D. DENNEY, as Administrator, etc., Real Party in Interest and Respondent.
No. F055054.
Court of Appeals of California, Fifth District.
May 1, 2009.
As modified May 14, 2009.
*887 Bruce J. Beland for Petitioner and Appellant.
Bernard C. Barmann, Sr., County Counsel, and Susan M. Gill, Deputy County Counsel, for Objector and Respondent.
Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, Catherine E. Bennett, Joseph D. Hughes and Joshua D. Meier for Real Party in Interest and Respondent.

OPINION
WISEMAN, Acting P. J. 
In this appeal we hold that Welfare and Institutions Code section 7275[1] does not violate equal protection when *888 applied to allow the state to seek reimbursement from the conservator of an Alzheimer's dementia patient who was committed to a state hospital, as a pretrial detainee, charged with the murder of his wife.

PROCEDURAL AND FACTUAL HISTORIES
In September 2005, 78-year-old Thomas Lee Edde, who suffers from Alzheimer's dementia, tragically murdered his wife Loretta after an argument. Criminal proceedings were initiated and the trial court found Thomas incompetent to stand trial within the meaning of Penal Code section 1368. The court ordered that Thomas be committed to Patton State Hospital for treatment and care pursuant to Penal Code sections 1370 and 1370.1, with the goal that Thomas be restored to competency. Criminal proceedings were suspended. A conservatorship over Thomas's estate was established in October 2006 in superior court case Conservatorship of Edde (Super. Ct. Kern County, No. S-1500-PB-55764) (conservatorship action). Thomas's daughter April Edde was appointed conservator. Respondent Kern County Public Guardian Kris Grasty (public guardian) is the current conservator of Thomas's person and estate.
After Loretta's murder, John D. Denney was appointed the administrator of Loretta's estate in superior court case Estate of Edde (Super. Ct. Kern County, 2008, No. S-1500-PB-54799) (probate action). Denney appears in this appeal as a real party in interest. Denney filed a petition to determine felonious and intentional killing in the probate action and a civil wrongful death action on behalf of Loretta's estate and her four adult children. Denney negotiated a settlement with April Edde of the wrongful death claim and all other claims against Loretta's estate. Denney then filed a petition seeking court approval of the settlement reached. The public guardian objected to the settlement on the ground that April Edde had violated her fiduciary duty in negotiating its terms. Appellant State Department of Developmental Services (DSS or state) objected on the ground that it had a claim on the estate in the amount of $200,423.67 for the cost of Thomas's care pursuant to section 7275. April Edde was removed as conservator and the court appointed the public guardian as Thomas's conservator. Denney and the public guardian negotiated an alternative settlement, which included an agreement that, in exchange for a payment of $50,000 from Loretta's estate to Thomas's estate, Thomas would release all remaining claims against the assets he held jointly with Loretta and those assets of Loretta's in which he held a beneficiary interest.
At the same time, DSS filed a petition for instructions in the conservatorship action and for an order that the conservator pay its claim. The public guardian objected, as did Denney, in his role as administrator of Loretta's estate, on equal protection grounds.
*889 While these matters were pending, and after Thomas had been at Patton for approximately 16 months, the trial court concluded that it was unlikely Thomas's competency would be restored. The court ordered that Thomas be released from custody and placed in a secured residential facility. The court retained jurisdiction and criminal proceedings remained suspended.
Because both the petition to pay and the objection to the alternative settlement involved the same issues, i.e., whether DSS was entitled to recover the cost of Thomas's care and from whom, the matters were heard together. The two matters were not, however, consolidated. The court approved the alternative settlement and denied DSS's claim, finding it would be a violation of equal protection to allow DSS to recover the cost of Thomas's care. Two separate orders were filed. The order overruling the objection to the proposed alternative settlement was filed on March 20, 2008. No appeal has been taken from that order. Consequently, in this opinion, we only address issues raised in the appeal from the conservatorship action, to which DSS prematurely filed a notice of appeal on February 22, 2008. The order denying the petition for payment, which ultimately was prepared by Denney, was filed April 23, 2008.

DISCUSSION

I. Scope and timing of the notice of appeal

As we have indicated, the notice of appeal was filed before the order was formally entered. (Cal. Rules of Court, rule 8.104(a).) In the interest of judicial economy, we will consider the premature notice as having been filed immediately after the order was entered on April 23, 2008. (Cal. Rules of Court, rule 8.104(e); see also In re Marriage of Gray (2007) 155 Cal.App.4th 504, 514 [66 Cal.Rptr.3d 87]; Matera v. McLeod (2006) 145 Cal.App.4th 44, 59 [51 Cal.Rptr.3d 331].)
The notice of appeal is very limited in scope. The appeal currently before us arises out of the conservatorship action only. As a result, we do not have jurisdiction to review any order from the probate action. (Hollister Convalescent Hosp., Inc. v. Rico (1975) 15 Cal.3d 660, 666 [125 Cal.Rptr. 757, 542 P.2d 1349] [appellate court has no jurisdiction to hear appeal absent timely filing of notice of appeal]; accord, Estate of Hanley (1943) 23 Cal.2d 120, 122 [142 P.2d 423].) The order in the probate action approving the settlement agreement resolved all challenges to assets held in Loretta's estate to which Thomas had claimed an interest, either as a surviving spouse, as a surviving joint tenant, or as a beneficiary. The order also found that DSS has no claim for reimbursement from Loretta's estate for costs incurred in caring for Thomas. With respect to Loretta's estate, the order approving the settlement and denying the state's claim is now final law of the case and binding upon DSS. It is not subject to review by this court.
*890 As a result, our analysis is limited only to review of the order filed in the conservatorship action and extends to whether DSS is entitled to seek reimbursement from Thomas's estate, as it exists after the settlement order approved in the probate action. (Soldate v. Fidelity National Financial, Inc. (1998) 62 Cal.App.4th 1069, 1073 [72 Cal.Rptr.2d 404] [appellate court's jurisdiction on appeal limited in scope to notice of appeal and order appealed from; where no appeal from separately appealable order, court cannot review issues arising out of nonappealed order]; accord, Polster, Inc. v. Swing (1985) 164 Cal.App.3d 427, 436 [210 Cal.Rptr. 567].) Consequently, we do not consider whether DSS is entitled to seek reimbursement from Loretta's estate under section 7275 given her spousal duty to support Thomas, nor do we review the allocation of assets formerly claimed by Thomas.

II. The state's claim against Thomas's estate

DSS claims that section 7275 grants the state an absolute and unconditional statutorily authorized claim against Thomas's estate for reimbursement of costs incurred in his care and treatment while at Patton State Hospital. The statute reads: "The husband, wife, father, mother, or children of a patient in a state hospital for the mentally disordered, the estates of such persons, and the guardian or conservator and administrator of the estate of such patient shall cause him to be properly and suitably cared for and maintained, and shall pay the costs and charges of his transportation to a state institution. The husband, wife, father, mother, or children of a patient in a state hospital for the mentally disordered and the administrators of their estates, and the estate of such person shall be liable for his care, support, and maintenance in a state institution of which he is a patient. The liability of such persons and estates shall be a joint and several liability, and such liability shall exist whether the person has become a patient of a state institution pursuant to the provisions of this code or pursuant to the provisions of Sections 1026, 1368, 1369, 1370, and 1372 of the Penal Code." (§ 7275.)
On its face, there is no question that section 7275 grants DSS a claim against Thomas's estate for the cost of his care and treatment while he is committed to Patton State Hospital. In spite of the clear statutory language, however, the public guardian argues that section 7275 is unconstitutional as applied to Thomas because it denies Thomas equal protection under the law. The public guardian claims that Thomas is similarly situated to inmates transferred to a state hospital for treatment while incarcerated and points out that these individuals are not asked to pay for their care. By asking Thomas to pay for his care, the public guardian contends the state is unfairly asking a small segment of society, specifically the pretrial detainee, to pay for the protection of society, which is and should be a public-borne cost.
*891 (1) "`The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.'" (In re Gary W. (1971) 5 Cal.3d 296, 303 [96 Cal.Rptr. 1, 486 P.2d 1201], quoting Purdy & Fitzpatrick v. State of California (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645].) We begin any equal protection analysis by asking whether the persons disparately affected are "similarly situated for purposes of the law challenged." (People v. Gibson (1988) 204 Cal.App.3d 1425, 1438 [252 Cal.Rptr. 56].) If so, we next examine whether there is a rational basis for the disparate treatment sanctioned by the Legislature. A classification is constitutionally infirm only if "so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." (Vance v. Bradley (1979) 440 U.S. 93, 97 [59 L.Ed.2d 171, 99 S.Ct. 939].) The equal protection clause contained in article I, section 7, of the California Constitution is coextensive with its federal counterpart found in the Fourteenth Amendment to the United States Constitution. (Department of Developmental Services v. Ladd (1990) 224 Cal.App.3d 128, 139 [273 Cal.Rptr. 485] (Ladd).)
The public guardian relies upon the California Supreme Court decision in Department of Mental Hygiene v. Hawley (1963) 59 Cal.2d 247 [28 Cal.Rptr. 718, 379 P.2d 22] (Hawley), a case interpreting former section 6650, which preceded section 7275.[2] In Hawley, the state sought reimbursement from a father for the care and treatment of his adult son who had been committed to a state mental hospital under the authority of Penal Code sections 1368, 1369, 1370 and 1370.1.[3] The court found that, when applied to the father, former section 6650 violated equal protection because there was no rational basis for treating relatives of individuals committed to state hospitals as pretrial detainees differently from relatives of individuals committed to state hospitals after conviction of a crime. The court noted that individuals "committed to a state hospital for the insane under provisions of the Penal Code [are] regarded by the state in a different light from [those] under civil commitment ...." (Hawley, supra, 59 Cal.2d at p. 252.) The court reasoned that, because the *892 commitment under Penal Code section 1026 or 1368 is a result of the state's interest in protecting the public, requiring relatives of these individuals to pay the cost of what is a state obligation creates a class of people that is unfairly burdened with a public cost. (Hawley, supra, at p. 255.)
Important to our analysis, the Hawley court was careful to distinguish the facts before it from the facts in Estate of Gestner (1949) 90 Cal.App.2d 680 [204 P.2d 77], in which the state sought reimbursement from the estate of the accused himself. The Hawley court said, "[w]e deem it fundamental that only one who has been charged with or convicted of a crime may be made to suffer deprivation of his liberty, or be subjected to other penal sanction, for that crime. In the case at bench the person so charged and so committed is defendant's sonnot defendant." (Hawley, supra, 59 Cal.2d at p. 256.)
A year later, the California Supreme Court explained its holding in the Hawley opinion in Dept. of Mental Hygiene v. Kirchner (1964) 60 Cal.2d 716, 721 [36 Cal.Rptr. 488, 388 P.2d 720] (Kirchner), as follows: "This holding [in Hawley] is dispositive of the issue before us. Whether the commitment is incidental to an alleged violation of a penal statute, as in Hawley, or is essentially a civil commitment as in the instant case [Kirchner], the purposes of confinement and treatment or care in either case encompass the protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause. [¶] ... [¶] . . . A statute obviously violates the equal protection clause if it selects one particular class of persons for a species of taxation and no rational basis supports such classification. [Citations.] Such a concept for the state's taking of a free man's property manifestly denies him equal protection of the law." (Kirchner, supra, 60 Cal.2d at pp. 720, 722-723.)
In Kirchner, the issue was whether an adult daughter's estate could be tapped for the care of a civilly committed mother. The court concluded that, even though the commitment was not the result of a charged crime, the state could not seek reimbursement from the adult daughter's estate without violating equal protection. Without an independent obligation to provide support, requiring an adult relative to pay for the cost of a civil commitment unfairly taxed one part of society without a rational basis for doing so, particularly because there was no consideration given to the patient's own ability to pay for the care. (Kirchner, supra, 60 Cal.2d at pp. 718-720.)
The next extension of the Hawley-Kirchner reasoning came in In re Jerald C. (1984) 36 Cal.3d 1, 11-14 [201 Cal.Rptr. 342, 678 P.2d 917], and *893 County of San Mateo v. Dell J. (1988) 46 Cal.3d 1236, 1252 [252 Cal.Rptr. 478, 762 P.2d 1202]. In both cases, the court found equal protection guarantees precluded the state from seeking reimbursement from the parent of a minor for a commitment pursuant to section 602, at least to the extent reimbursement was sought for the costs of confinement ordered to protect the public. These cases held that, even though there is a preexisting obligation to support a minor child, the state could not seek reimbursement from a parent for what is a state function, the administration of criminal justice.
(2) In County of San Mateo v. Dell J., however, the court held that, if reimbursement was sought only for the actual costs of the minor's support and maintenance, there was no violation of equal protection. (County of San Mateo v. Dell J., supra, 46 Cal.3d at p. 1252.) The court in County of San Mateo v. Dell J. summarized its holding as follows: "We reaffirm the teaching of Kirchner and its progeny which explains that fundamental principles of equal protection preclude a statutory scheme for reimbursement of public assistance from requiring a class of responsible relatives (here the parents) to alone bear the costs of confinement, treatment, rehabilitation or supervision of a dependent (here the minor) whose custody is removed from the family, voluntarily or pursuant to court order, in whole or in part for the benefit and protection of society. In contrast, where a preexisting legal obligation of support of the dependent is established, there is no constitutional impediment to the state seeking reimbursement from the responsible family members of the reasonable costs of support and maintenance of such dependent for the duration of his placement outside the family home, where such uniform costs can be identified and segregated out from nonallowable costs, allocated amongst similarly situated dependents in a reasonable manner, and where the responsible relatives' liability is subject to reduction according to their reasonable ability to pay." (County of San Mateo v. Dell J., supra, 46 Cal.3d at p. 1252.)
What these cases tell us is that, regardless of the nature of the commitment, the state may not seek reimbursement under section 7275 from a relative who has no independent obligation of support. In addition, the state may not seek reimbursement under section 7275 from a relative, regardless of any obligation to support, for the cost of a commitment to protect the public after a criminal adjudication, because to do so unfairly taxes a small segment of society for the costs incurred for the benefit of the larger society. None of these cases directly addresses the issue raised here, whether DSS may seek reimbursement from Thomas's estate for the cost of his own treatment and care at Patton State Hospital as a pretrial detainee.
The public guardian argues that the rationale behind Hawley applies here because Thomas was committed as one accused of a crime in order to protect *894 the public and, therefore, his commitment serves a criminal justice interest, a cost the state should bear. (Hawley, supra, 59 Cal.2d at pp. 251-255.) The public guardian's argument pits two classes of individuals against one another, those civilly committed and those committed under compulsion of the criminal justice system. She argues there is no rational reason for treating Thomas differently from others who are convicted of crimes and who receive care and treatment as part of their incarceration. These individuals are not required to pay for the costs of their care and treatment, and Thomas should not be required to do so either.
In response, DSS argues that these two classes of individuals are not similarly situated, that Hawley is limited to its facts, and that the controlling authority is Ladd, supra, 224 Cal.App.3d 128. Ladd was a declaratory relief action in which the trial court found that section 7275 authorized the state to charge a state hospital patient for the cost of the patient's institutional care, support, and maintenance following commitment pursuant to Penal Code section 1026. The individual in Ladd had been involuntarily confined subsequent to being found not guilty by reason of insanity after killing her two sons. Rejecting an equal protection challenge similar to the one raised here, the appellate court affirmed after a thorough and extensive analysis of the Hawley decision and the cases following.
Addressing the protection-of-society concept examined in Hawley, the Ladd court stated that, while obvious that confining a person accused of a crime in a state hospital serves to protect society, the commitment also provides care and treatment to the patient. (Ladd, supra, 224 Cal.App.3d at p. 138.) Ladd concluded, "assessing the estates of Penal Code section 1026 patients for the costs of institutional care does not arbitrarily shift societal costs to a small segment of the public. The very costs exist only because the state is providing a treatment setting in the state hospital for the benefit of the patient." (Id. at p. 139.) The court noted that no California court had ever held that a patient should not be charged for his or her own hospital care and treatment. (Id. at p. 137.) The court opined that requiring a patient to pay for his care out of his own estate is "`wise and reasonable'" and does not violate any constitutional violation against class legislation. (Id. at p. 137 & fn. 5, quoting Estate of Yturburru (1901) 134 Cal. 567, 568-569 [66 P. 729].) The court held that the legislative determination to charge those committed to state hospitals for their care after being acquitted of their crimes due to insanity, and not to charge those transferred to state hospitals for care following a conviction, was grounded in a rational relationship to a legitimate governmental purpose. (Ladd, supra, 224 Cal.App.3d at p. 139.) In other words, there is no equal protection violation.
The court limited the application of its analysis to those committed to a state hospital pursuant to Penal Code section 1026 after being acquitted of *895 their charged crimes on the ground that they were insane at the time the offense was committed. The court clarified that it was not addressing whether there was an equal protection problem with charging patients hospitalized upon a finding of incompetency to stand trial for their care and treatment. (Ladd, supra, 224 Cal.App.3d at p. 143, fn. 11.) We are faced with the issue Ladd did not decide.
Thomas was committed to Patton State Hospital pursuant to Penal Code section 1368 after being found incompetent to stand trial. He has not been acquitted for reasons of insanity, as was the individual in Ladd; criminal proceedings remain suspended. We conclude that the analysis and conclusion in Ladd appropriately apply to the facts of this case. In Ladd, the two classifications compared for disparate treatment were (1) those mentally disordered individuals who are convicted inmates and are receiving care at state hospitals after transfer by the Department of Corrections and Rehabilitation, and (2) those mentally disordered individuals admitted directly to a state hospital and who have been acquitted of their criminal charges by reason of insanity. Under the statutory scheme, the first are not charged for their treatment but the second are charged. Here, we are faced with only slightly different classifications: (1) those mentally disordered individuals who are convicted inmates and are receiving care at state hospitals after transfer by the Department of Corrections and Rehabilitation, and (2) those mentally disordered individuals admitted directly to a state hospital because they are incompetent to stand trial.
(3) The Ladd court reasoned that, once an inmate is convicted of a crime and committed to prison, the state bears the responsibility to provide care for that inmate. This is consistent with the conclusion in Hawley that it is the state's responsibility to administer the criminal justice system. The Ladd court, however, concluded there was a rational basis for treating differently those individuals committed to state hospitals who have been convicted and sentenced to prison from those committed under the Penal Code, but who have not yet been convicted of a crime. Under state law, the Department of Corrections and Rehabilitation bears the responsibility for the care and treatment of those convicted of crimes and confined to prison and may transfer inmates to state hospitals for care and treatment. (Pen. Code, §§ 5054, 2684.) Although the stay at a state hospital for a convicted inmate may be indefinite, a prisoner who is transferred pursuant to section 2684 is still serving a sentence in state prison and is confined pursuant to a judgment. (People v. Watson (2007) 42 Cal.4th 822, 829 [68 Cal.Rptr.3d 769, 171 P.3d 1101].) "[T]he transfer is for an unspecified period within the term of imprisonment prescribed by the inmate's sentence." (Ibid.)
*896 In contrast, one committed to a state hospital as a result of being acquitted by reason of insanity is committed as a result of present mental illness and not as punishment for a crime. It is possible that the individual could recover and return to society. Consequently, individuals in these two categories are not similarly situated and, even if they were, there is a rational basis for distinguishing between them. (Ladd, supra, 224 Cal.App.3d at pp. 143-144; see also Fetterusso v. State of N.Y. (2d Cir. 1990) 898 F.2d 322, 325-327 [rejecting equal protection argument challenging N.Y. statutory scheme that allows mental health acquittees to be charged for their care when convicted inmates transferred to state hospitals for psychiatric care are not charged; court finds legitimate governmental purpose in having committees pay for own care].)
(4) Individuals committed to a state hospital after being found incompetent to stand trial are not yet convicted of a crime. They are not inmates and are not under the authority of the Department of Corrections and Rehabilitation. Denney correctly makes the point that any person committed to a state hospital pursuant to the Penal Code is committed for "care and treatment under conditions of custodial security which [may] be better provided within the Department of Corrections ...." (§ 7301.) If so, "such person may be transferred for such purposes from an institution under the jurisdiction of the State Department of Mental Health to an institution under the jurisdiction of the Department of Corrections." (§ 7301.) The court, however, still retains jurisdiction over the individual, and the individual does not fall fully under the authority of the Department of Corrections and Rehabilitation as would a convicted person. (Ibid.; see also Pen. Code, § 1370.)
Penal Code section 1369 grants the trial court the authority to commit an incompetent defendant to a secure regional center or state hospital. The trial court controls the placement of the defendantnot the Department of Corrections and Rehabilitation. (Pen. Code, § 1369, subd. (a).) The future placement and care of an incompetent individual is uncertain. The individual might regain sanity and stand trial. (Pen. Code, § 1370, subd. (a).) At trial there could be a conviction or an acquittal. Alternatively, an incompetent individual might never regain sanity. Once it becomes apparent the individual is unlikely to regain sanity, the court has several options, including the creation of a conservatorship and alternative placement considerations. (Pen. Code, §1370, subds. (b)(1), (2), (c)(1), (2).)
In this case, we know that Thomas will not face trial for his crime because he will never regain sanity. (See Health & Saf. Code, § 125275, subd. (b) [no *897 cure or treatment for Alzheimer's].) He will never be an inmate of the Department of Corrections and Rehabilitation and will not be placed under the care of the state for a specified period of time pursuant to a criminal sentence. Thomas was committed to a state hospital because of his present mental illness and is not situated similarly to those individuals who have been convicted of a crime and sentenced to a term in state prison. As Justice Poché observed in his concurring opinion in Ladd, "It is entirely reasonable that the state may undertake to shoulder the costs of maintaining and supporting those it punishes with a prison sentence. Both the administrative convenience of prison administration and common decency may compel the hospitalization of inmates suffering severe physical or mental illness. (See [Pen. Code,] § 2684.) Nonetheless such inmate-patients are serving timethey have been found culpable for a crime for which they are being punished. Two mental patients in adjacent beds, one a [Penal Code] section 1026 committee and one an inmate-patient, are not similarly situated for the purposes of equal protection analysis." (Ladd, supra, 224 Cal.App.3d at p. 145 (conc. opn. of Poché, J.).) We conclude that Thomas, an individual committed pursuant to Penal Code section 1368, is not similarly situated to an incarcerated inmate who is transferred to a state hospital after conviction.
Even if Thomas is similarly situated, there is a rational basis for treating him differently from those inmates in the custody of the Department of Corrections and Rehabilitation who are transferred to state hospitals for care and treatment. "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." (Baxstrom v. Herold (1966) 383 U.S. 107, 111 [15 L.Ed.2d 620, 86 S.Ct. 760].) Since Thomas has not been convicted of a crime, and his incompetency has led to the creation of a conservatorship, the public guardian is charged with representing Thomas's best interests, including protection of his property. Acting in this capacity, the public guardian owes a fiduciary duty to Thomas. (Prob. Code, § 2101; Transamerica Homefirst, Inc. v. Superior Court (1999) 69 Cal.App.4th 577, 580 [81 Cal.Rptr.2d 705] [public guardian stands in fiduciary relationship with conservatee].) The public guardian is able to review the claim made by DSS against the estate for Thomas's care to ensure the claim's accuracy and reasonableness and to raise any challenge to the claim in the conservatorship proceedings.
(5) On the other hand, an inmate serving time who is transferred to a state hospital for care and treatment has no public guardian protecting his property interests. As far as we can determine, the Department of Corrections *898 and Rehabilitation has no corollary fiduciary responsibility to protect the property estate of an inmate. Although reasonable minds may differ regarding whether this distinction is the best policy, the scheme adopted by the Legislature need not be perfectjust a rational one. We cannot say there is no rational basis for the distinctions drawn by the Legislature. (Ladd, supra, 224 Cal.App.3d at p. 143.)
We are also not persuaded that Penal Code section 4011.1 compels a different result. In deciding equal protection claims, we look to see if individuals are similarly situated for purposes of the law challenged. (People v. Hofsheier (2006) 37 Cal.4th 1185, 1199 [39 Cal.Rptr.3d 821, 129 P.3d 29].) Section 7275 allows reimbursement for costs incurred for care and treatment at state hospitals. Penal Code section 4011.1 allows local institutions to seek reimbursement for medical treatment, hospitalization, surgical, dental, and optometric care from those serving local time, but excepts care resulting from injury while incarcerated and care or testing mandated by law. The implicit argument is that commitment pursuant to Penal Code section 1368 is care mandated by law, which would create a new category of individuals who would not be charged with the costs of their care. Penal Code section 4011.1, however, does not authorize treatment at a state hospital nor does it pertain to commitments pursuant to Penal Code section 1368.
Even if we were to consider Penal Code section 4011.1 to be sufficiently related to Welfare and Institutions Code section 7275 for an equal protection analysis, we would conclude the disparate treatment authorized by the legislative scheme to be rationally related to a legitimate governmental end. Local penal institutions, like those under the authority of the Department of Corrections and Rehabilitation, have no obligation to protect the property interests of pretrial detainees. In contrast, section 7275 authorizes reimbursement from a guardian, administrator, or conservator of an individual's estate for care provided by a state hospital. These individuals have a fiduciary obligation to protect the interests of the committed individual.
(6) We hold there is no equal protection violation in the legislative determination that estates of individuals committed to state hospitals pursuant to Penal Code section 1368 as pretrial detainees may be held liable for the cost of their care and treatment. Consequently, the order of the trial court is reversed. The matter is remanded for further proceedings on any remaining challenges asserted by the public guardian to DSS's claim. We offer no opinion on whether DSS's claim is payable in full or in part.

*899 DISPOSITION

The order in the conservatorship action rejecting DSS's claim against Thomas's estate on equal protection grounds is reversed. The matter is remanded for further proceedings on any remaining challenges asserted by the public guardian to DSS's claim. We offer no opinion on whether DSS's claim is payable by the conservatorship in full or in part, other than to say the claim is not barred by the state or federal constitutional equal protection clause. Each party shall bear its own costs.
Gomes, J., and Dawson, J., concurred.
NOTES
[1] All further references are to the Welfare and Institutions Code unless otherwise specified.
[2] Former section 6650 was first enacted in 1937, was amended a number of times without significant change in substance, and repealed in 1967 when the section was reenacted and renumbered. (Former § 6650, added by Stats. 1937, ch. 369, p. 1005, as amended by Stats. 1941, ch. 916, § 1, p. 2503; Stats. 1943, ch. 1052, § 1, p. 2991; Stats. 1945, ch. 247, § 1, p. 710; Stats 1947, ch. 625, § 1, p. 1632; Stats. 1965, ch. 1797, § 31, p. 4155, repealed by Stats. 1967, ch. 1667, § 36.5, p. 4107.) The two sections contain nearly identical language and historically have been applied in the same manner. We see no discernable difference in the statutory provisions. (See Department of Mental Hygiene v. Bank of America (1970) 3 Cal.App.3d 949, 951, fn. 1 [83 Cal.Rptr. 559].)
[3] All four of these sections relate to the finding of incompetency of a pretrial detainee and subsequent commitment to a state hospital. In the future, we will refer only to Penal Code section 1368 as shorthand for the entire statutory scheme for commitment of pretrial detainees.