Filed 1/18/23  Stacy V. v. Frank B. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| STACY V., | B316943 |
| Respondent, | (Los Angeles County Super. Ct. No. LF005780) |
| v. | |
| FRANK B., | |
| Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Firdaus F. Dordi, Judge.  Affirmed.

Frank B., in pro. per., for Appellant.

Cohen and Schwartz and Kenneth L. Schwartz for Respondent.

_____

Frank B. (Father) appeals from a family court order denying his request to modify a final custody order that gave Stacy V. (Mother) sole legal and physical custody over their two children.  Father contends the family court erred in excluding

from evidence reports prepared by the Department of Children and Family Services (DCFS) and other documents offered to support his request, and he was entitled to joint custody because Mother alienated the children from him and violated existing visitation orders. The court did not abuse its discretion in excluding Father's evidence. Further, Father's admissible evidence did not compel a finding there was a significant change in circumstances such that a modification would be in the children's best interest. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Prior Custody Orders*

This is Father's second appeal in this child custody action. As we described in *Stacy V. v. Frank B.* (Dec. 18, 2019, No. B293010 [nonpub. opn.]), Mother lives in Tarzana and works as an elementary school teacher. Father lives in Woodland Hills, about 20 miles from Mother, and has been retired since 2008. Mother and Father met in 2009, and they have two children together, Brendan (born in 2010) and Luke (born in 2011). Mother and Father never married or lived together.

On September 29, 2011 Mother filed a petition in family court seeking sole legal and physical custody over the boys and child support. Father filed a cross-petition seeking joint legal and physical custody, with no child support. On September 30, 2013 the family court[1] issued a pendente lite custody order awarding Mother sole legal and physical custody, with visitation for Father, after finding Father engaged in "unrelenting attacks" on Mother and refused to cooperate in coparenting.

---

[1]    Commissioner Steff R. Padilla.

On May 5, 2016 the family court[2] granted Father's request for joint legal and physical custody in light of his completion of classes and therapy and on the recommendation of the court-appointed child custody evaluator. The court imposed conditions to facilitate coparenting, including that Mother and Father could only communicate with each other through Our Family Wizard (OFW) messaging software, and the court admonished each parent to "refrain from controlling the other parent in his or her parenting" and "to limit critical, insulting and destructive emails to the other parent."

At a May 24, 2017 settlement conference, Mother and Father executed a stipulation and order of settlement providing for joint legal and physical custody with a parenting plan and allocation of child-rearing expenses. A stipulated judgment was entered on August 17. However, on April 5, 2018 Mother filed a postjudgment request for order awarding her sole legal and physical custody of the boys. Mother argued Father had been extremely controlling and incapable of coparenting, and he would lash out at her "almost daily" over OFW, interfering with her custodial time and making handoffs and practical accommodations difficult. Mother also asserted the boys spent too much time shuttling between the parents' homes and school; Father had become "obsessed" with the boys' participation in sports; Father proposed to separate the boys for custody purposes because Luke was more athletically inclined than Brendan; and Father had taken the boys to a physical examination without Mother's consent.

On July 27, 2018 the family court granted Mother's request and awarded her sole legal and physical custody of the boys (the

[2]    Judge Shirley K. Watkins.

3

July 2018 custody order).  The court found Mother presented credible evidence of changed circumstances adversely impacting the boys.  The modified parenting plan provided that during the school year Father had visits with the boys on the first, third, and fifth weekends of the month and Tuesday and Thursday afternoons.  During the summer the parents had custody of the boys on alternating weeks, as well as alternating holidays and vacations.

Father appealed the modified custody order, and on December 18, 2019 we affirmed.  (*Stacy V. v. Frank B., supra*, No. B293010.)  We held, "The trial court did not abuse its discretion in finding Father's continued abusive behavior toward Mother in sending her dozens of messages berating her parenting style constituted a changed circumstance supporting a grant of sole legal and physical custody to Mother because of Father's inability to coparent their sons and his interference with Mother's custodial time."  (*Id*.)  We noted Father could prospectively seek joint custody based on a showing of changed circumstance or that a modification of the visitation schedule was in the boys' best interests.

B.      *Father's RFO To Modify Custody*

On January 21, 2021 Father filed a request for order (RFO) seeking modification of the July 2018 custody order to award him joint legal and physical custody of the boys with an equal timeshare.  On March 25 the family court set an evidentiary hearing on the RFO and ordered the parties to submit declarations setting forth their positions and attaching supporting documents as exhibits.  The court clarified that the

4

declarations would serve as the parties' direct testimony, with cross-examination in court.[3]

In his April 22, 2021 declaration, Father asserted as changed circumstances that Mother alienated the boys from Father (especially 10-year-old Brendan), and the parental alienation constituted emotional child abuse. He also argued Mother repeatedly violated the July 2018 custody order, interfering with his visitation. Father averred that by Mother's own admission, the boys were "'doing great'" at the time of the July 2018 custody order, yet by September 2020 Brendan was suicidal.[4] Father stated Raychel Richard, a DCFS social worker who investigated a March 2019 welfare referral concerning the boys, determined that Brendan's therapist (Anne Marsh) was biased against Father, and this had the potential to exacerbate Brendan's alienation from Father.

Father's declaration quoted numerous excerpts from "Delivered Service Logs" produced by DCFS, which documented

---

[3] Judge Firdaus F. Dordi presided over the case in 2021 and made all rulings at issue on appeal. Mother filed a declaration on April 18, 2021 opposing the RFO, but her declaration is not included in the appellate record. On May 11 Luke and Brendan's court-appointed attorney filed a declaration in opposition to the RFO.

[4] Father attached and the family court admitted into evidence Mother's September 30, 2020 declaration opposing an earlier request for order, in which Mother wrote, "Our son Brendan has been experiencing suicidal episodes, has been physically hurting himself. Brendan is in no condition physically, emotionally and/or mentally to commence any sort of reunification therapy with [Father] at this time, or in the near future."

several social workers' investigations of both the March 2019 welfare referral and a second referral in June 2020 (the DCFS reports). The March 2019 delivered service logs contained entries prepared by social workers Rebecca Megerdichian and Shannon Morris describing their own observations and conversations with witnesses. The logs also contained information the two social workers received from Richard, who had performed an assessment of Mother's home on March 23, 2019. The June 2020 delivered service log contained entries reflecting written and oral statements from Richard to Morris describing Richard's observations and conversations with witnesses, as well as information conveyed to Richard by other social workers. Father's declaration quoted portions of these reports indicating social workers observed Mother trying to alienate the boys from Father by, among other things, badmouthing Father, coaching the boys to lie about Father to the social workers, and encouraging Brendan to communicate constantly with Mother during Father's custodial time. Father also cited these reports to show Mother's home was unsafe because it was dirty; she allowed the boys to play video games and eat junk food with abandon; and she controlled what they could wear.

Father's declaration described his participation in a continuing legal education seminar titled "Reunification in Case involving Parental Alienation" and cited (but did not attach) several "learned treatises" ostensibly defining parental alienation and describing the typical behaviors utilized by parents to alienate children. Father attested, "I have observed our son Brendan exhibit all of these behaviors during his custodial timeshare visits with me, most pointedly during the past two (2) years . . . ." Father also cited publications stating parental alienation is a form of "'emotional child abuse'" that has adverse

6

impacts on a child's welfare, including loss of self-respect, low self-esteem, guilt, anxiety, depression, lack of impulse control, impaired relations, and educational problems. Father stated he had observed Brendan exhibiting all of these behaviors. For example, Brendan was anxious, he slept with his older half-sister because he was scared at night, he did not wish to visit with Father, he was addicted to video games, and he ate junk food and sweets. In addition, Father recounted that Marsh told him that she planned to start Brendan on anti-depressant drugs to counter his suicidal thoughts.

Finally, Father's declaration described Mother's alleged violations of the July 2018 custody order. These included an incident on December 29, 2020 when Brendan refused to go from Mother's vehicle into Father's vehicle during a scheduled exchange. Father stated he heard Mother tell Brendan, "'You don't have to go with him if you don't want to.'" Father called the police, and the Los Angeles County Sheriff's Department (LASD) prepared an incident report, which Father attached to his declaration. Father cited another occasion on January 10, 2021 when Mother refused to acknowledge Father's visitation time.[5] Father also averred Mother worked to frustrate the custody plan

---

[5] OFW messages between Mother and Father attached to Father's declaration and admitted into evidence showed Mother and Father disagreed on who had custody of the boys under the July 2018 custody order for the night of Sunday, January 10, 2021 continuing into Monday. Father asserted a school closure on Monday operated to extend his first-weekend-of-the-month visitation to Monday. However, Mother contended her winter vacation schedule superseded Father's visitation because she and the children were concluding a winter vacation, which allocated custody for Sunday evening to Mother.

by failing to include Father's contact information on school registration forms; refusing to provide Father with copies of the boys' insurance and social security cards; preventing Brendan from participating in evening video calls with Father during her custodial time; taking photographs of the boys during calls with Father and sending them to Marsh; instructing Brendan to delete images on Father's phone and tablet that would have revealed Brendan was not participating in calls with Father; moving with the boys to a different residence in late 2019 without advising Father; discussing court orders with the boys; and providing Father "false and misleading information" about their hybrid school schedule during the COVID-19 pandemic.

On May 11, 2021 minor's counsel Gregory Pedrick served evidentiary objections to the 22 exhibits attached to Father's declaration on the grounds of lack of foundation, lack of authentication, hearsay, and (as to some exhibits) improper opinion testimony. On May 14 the court filed "[p]rovisional" written rulings on the objections, sustaining objections to the DCFS reports and LASD incident report, as well to emails authored by Marsh, Richard, and Pedrick, but overruling objections to the transcripts of prior proceedings, party declarations, and correspondence between Mother and Father.[6]

---

[6] The family court also sustained Pedrick's objections to Father's submission of declarations executed years earlier by Father's adult children and a prior therapist, school registration forms, and photographs Father alleged Brendan had tried to delete from his phone and computer.

C.    *Evidentiary Hearing*

The family court conducted an evidentiary hearing on the RFO on May 21 and August 6, 2021. Mother was represented by counsel; Father was self-represented; and Brendan and Luke were represented by Pedrick. Mother's attorney called DCFS social workers Morris and Richard as witnesses. In addition, the court allowed Father and Mother to provide direct testimony as to recent developments.[7]

Morris testified she was the DCFS supervising social worker assigned to a 2019 referral, and she conducted some of the interviews in connection with the investigation, including with Father and the boys at the DCFS office and with Mother over the telephone. The referral alleged possible physical abuse by Father, the children were afraid of Father and did not want to go to his house, and Father was allegedly shoplifting in their presence. Based on its investigation, DCFS concluded the referral was unfounded as to neglect and alleged physical abuse by Father, and inconclusive as to emotional abuse by either Father or Mother. Morris did not recall Father raising Mother's parental alienation, and in any event, that was not her role to diagnose. However, Morris found "it was possible that the [children were] being asked to say things that were not true." Specifically, Morris believed Mother asked the children to exaggerate complaints about living with Father, including that

_____

[7]    At the May 21, 2021 hearing, Mother's counsel briefly cross-examined Father about his arrest for shoplifting in 2019 and completion of a diversion program, but the family court curtailed the examination on the basis of relevance. Mother's counsel also cross-examined Father about his assertion his actual parenting time was less than what the July 2018 custody order provided. Father did not cross-examine Mother.

9

there was "hitting" occurring in his home, they had a fear of Father, and they disliked the food and clothing at his home. Morris opined that a parent coaching a child could "in extreme situations rise to the level of a type of emotional abuse," but she did not find the situation in 2019 to be extreme. Morris also felt Marsh, Brendan's therapist, was "aligned or only spoke to [Mother] and the children." However, Morris did not recall making a finding Marsh was biased against Father. On redirect examination, Marsh testified she had a specific recollection she reviewed the 2019 DCFS report for accuracy. Based on this admission, Father moved to admit the report into evidence. The court held the report was not admissible, finding that even if it had been authenticated, it constituted hearsay and Father had not established that it fell within the business record exception to the hearsay rule.[8]

Richard testified she first visited with Brendan and Luke in Mother's home on March 23, 2019. During the visit, the home was messy, and there was a strong odor of animal urine. Brendan and Luke were shy and unwilling to speak with her. They whispered to Mother, and "Brendan was holding on to his mom pretty tightly." Richard took Mother aside and expressed concern that Mother was speaking negatively about Father in the boys' presence. Mother was defensive and responded that Father was a thief and a criminal. Asked if she saw signs of emotional distress in the boys, Richard responded, "Based on the children not being comfortable talking to me and also the negative comments made in front of the children, I did express my concern

---

[8] Although the family court advised Father he could potentially still use the report to refresh Morris's recollection, Father did not attempt to do so.

10

to the mother." In the course of her investigation, Richard was also concerned that Brendan spoke with Mother excessively during visitation with Father, sometimes calling Mother multiple times, and Mother was interfering with Father's custodial time. She observed anxiety in Brendan (but not Luke), and she believed Brendan was making inaccurate statements to social workers under Mother's influence. Richard also spoke to Marsh and found she "had a negative feeling about the father" and "failed to engage him in the therapeutic setting." Further, Marsh was sharing with Mother information obtained in therapy sessions with Brendan. However, Richard did not have concerns regarding the children's safety in either Mother's or Father's home; she did not find physical abuse in either home; and as to Mother, "the emotional abuse did not rise to the level of intervention. Therefore, it was referred to the therapist and deemed unfounded." Richard recommended Father and Brendan seek joint counseling, and Mother was receptive to the idea.

Father testified that Mother continued to alienate the children from him. During Mother's custodial time, Brendan would not participate in calls with Father "99 percent" of the time, and Father could see Mother hovering over the boys during video calls. Mother also persisted in furnishing the boys with clothing and food for their visits with him.

Mother testified Father had access to both boys without her interference whenever he called, although sometimes Brendan would be short with Father of his own accord. Mother did not monitor the boys' calls with Father, although she would sometimes hear the calls when Father called while they were in Mother's car. Mother acknowledged Brendan brought his own clothes to visits with Father. Mother was not involved in Brendan's packing and felt Brendan was "old enough to do what

11

he needs to do. . . , whatever he wants to bring." Similarly, Brendan packed himself snacks without Mother's involvement. Although it was then summer vacation and Father had the boys on alternating weeks, Father often brought Brendan to Mother's house for a few hours during Father's custodial time while Luke was at his sports practice, because the parents agreed Brendan should not sit on the sidelines in the heat while Luke practiced.

The family court questioned Mother about how Brendan was doing. Mother stated Brendan was doing very well in therapy. She believed his anxiety had lessened and he was faring better because he was able to see Mother occasionally during his weeks with Father, in contrast to the previous summer when Brendan struggled with weeklong visits. Father agreed with Mother that "since this year, it's been better." The court also asked Mother if she wanted to address Richard's testimony. Mother conceded her house was not perfectly tidy during Richard's March 2019 visit, but the house was clean and stocked with food, and there had never been any complaints about the children being dirty. Mother testified she did not limit Father's access to the boys during her custodial time, adding, "They could call their dad any time. I don't limit that. I encourage them to have a relationship with [Father]."

D.    *The Family Court's Order Denying the RFO*

After the conclusion of testimony and closing arguments, the family court announced its findings from the bench.[9] The court found Father failed to show changed circumstances concerning parental alienation, explaining, "[Father] not only continues to have the parental time that was allocated to him

---

[9]    Father withdrew his request for a statement of decision.

12

under [the July 2018 custody order], but he also has telephonic contact with the children. To the extent that he feels that Brendan, who's now 10, does not want to have the full range of that contact for some of those calls, . . . he hasn't demonstrated that that's [Mother's] doing." The only deviation from the custody order had been Brendan's visits with Mother during Luke's summer sports practice, and both parents supported this. The court also found Father's testimony that Mother hovered over the boys during video calls was "not credible," and Father in any event did not present evidence Mother was an "active participant and trying to control the nature of the communication, or telling the kids to get off." The court credited Mother's testimony she was not sending food or clothes with Brendan, and instead Brendan was packing his own bag. The court found Father' testimony he had virtually no one-on-one time with Brendan to be valid but noted this had been a recurring feature in the case not caused by Mother, and Mother was supportive of increased time between the two. The court credited the social workers' testimony and expressed concern about the condition of Mother's home, but it found the testimony did not demonstrate parental alienation.

The family court also found Father did not meet his burden to show changed circumstances with respect to Mother's violation of the July 2018 custody order. The court found Brendan's refusal to go with Father in December 2020 was not Mother's fault, and Mother credibly testified in her declaration opposing the RFO that she had not denied Father access to the children's health insurance and social security information. Likewise, Father did not demonstrate he was not a parental contact with the children's school.

13

The family court found, "There have been issues that have arisen since the 2018 orders that the court does find are considerable. One was [Father's] arrest and the investigation that stemmed from that. Another are the concerns that were raised to the court about Brendan's health and welfare with respect to what he was going through and potentially still going through . . . . [T]hose things are significant circumstances." However, the court concluded these circumstances did not constitute changed circumstances supporting joint custody for Father. Rather the court recommended (but did not order) conjoint therapy for Father and Brendan with an independent therapist. On August 6, 2021 the court issued a minute order with findings consistent with its ruling from the bench.

Father timely appealed.[10]

---

[10] In his opening brief, Father purports to seek review of the family court's August 24, 2021 order striking his request to disqualify Judge Dordi under Code of Civil Procedure section 170.1. Father's notice of appeal did not identify the August 24, 2021 order, and the issue is therefore outside the scope of our review. (See *Conservatorship of Edde* (2009) 173 Cal.App.4th 883, 889-890 [appellate court's "analysis is limited only to review of the order" identified in the notice of appeal]; *Soldate v. Fidelity National Financial, Inc.* (1998) 62 Cal.App.4th 1069, 1073 [separately appealable order "is not reviewable on appeal, unless [the order] is expressly specified in a notice of appeal"].) In addition, the exclusive means for review of a determination on the disqualification of a judge is by petition for writ of mandate in accordance with Code of Civil Procedure section 170.3, subdivision (d), not an appeal from the order. (See *Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1059.)

Father also purports in his reply brief to seek review of the family court's August 16 and September 20, 2022 orders denying

**DISCUSSION**

A.    *Legal Standard for Custody Modification*

"Under California's statutory scheme governing child custody and visitation determinations, the overarching concern is the best interest of the child." (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255 (*Montenegro*).) In determining the best interest of the child, the court must consider "all relevant factors, including the child's health, safety, and welfare, any history of abuse by one parent against any child or the other parent, and the nature and amount of the child's contact with the parents." (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 955-956 (*Brown & Yana*).)

"Once the trial court has entered a final or permanent custody order reflecting that a particular custodial arrangement is in the best interest of the child, 'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining' that custody arrangement. [Citation.] In recognition of this policy concern, we have articulated a variation on the best interest standard, known as the changed circumstance rule, that the trial court must apply when a parent seeks modification of a final judicial custody determination." (*Brown & Yana, supra*, 37 Cal.4th at p. 956.) Under the changed circumstance rule, "a party seeking to modify a permanent

---

his subsequent requests for modification of custody. These orders are not encompassed within Father's notice of appeal and are not properly before us. (*Conservatorship of Edde, supra*, 173 Cal.App.4th at pp. 889-890.)

15

custody order can do so only if he or she demonstrates a significant change of circumstances justifying a modification. [Citation.] . . . [A court] should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest." (*Montenegro, supra*, 26 Cal.4th at p. 256; see *In re Marriage of McKean* (2019) 41 Cal.App.5th 1083, 1089-1090 [family court's modification of custody order from joint to sole custody was abuse of discretion because of lack of evidence of changed circumstances].)

Generally, "[w]e review custody and visitation orders for an abuse of discretion, and apply the substantial evidence standard to the court's factual findings." (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497; see *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [noting abuse of discretion standard applies to review of custody and visitation orders, but applying substantial evidence standard to factual determinations supporting relocation order].) "Under this test, we must uphold the trial court 'ruling if it is correct on any basis, regardless of whether such basis was actually invoked.'" (*Montenegro, supra*, 26 Cal.4th at p. 255.)

However, a different standard applies where, as here, the appellant had the burden of proof in the family court. "'In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' [Citation.] 'Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.'" (*Juen v. Alain Pinel Realtors, Inc.*

16

(2019) 32 Cal.App.5th 972, 978-979 (*Juen*); accord, *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's*); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

"'Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Juen*, *supra*, 32 Cal.App.5th at p. 979; accord, *Glovis America, Inc. v. County of Ventura* (2018) 28 Cal.App.5th 62, 71; *Dreyer's, supra*, 218 Cal.App.4th at p. 838.) "'[W]here . . . the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor.'" (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734; accord, *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.) "That is because unless the trial court makes specific findings of fact in favor of the losing [party], we presume the trial court found the [losing party's] evidence lacks sufficient weight and credibility to carry the burden of proof. [Citations.] We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." (*Bookout*, at p. 1486.)

B.     *The Family Court Did Not Abuse Its Discretion in Excluding Father's Hearsay Evidence*

Father contends the family court erred in excluding the DCFS reports and other exhibits attached to his declaration. We review the family court's evidentiary rulings, which principally involved the application of the hearsay rule, for an abuse of

17

discretion.  (*People v. Waidla* (2000) 22 Cal.4th 690, 725 ["an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question"]; accord, *People v. Yates* (2018) 25 Cal.App.5th 474, 484; see *Zanone v. City of Whittier* (2008) 162 Cal.App.4th 174, 190, fn. 21 ["We review the exclusion of hearsay evidence on the ground it does not qualify for admission as a business record for abuse of discretion."].)

 With respect to the DCFS reports, the family court found Father failed to establish the reports were admissible under the business records exception to the hearsay rule.[11]  The Evidence Code provides two exceptions for agency reports relevant here. Evidence Code section 1280, the official records exception, provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies:  [¶] (a) The writing was made by and within the scope of duty of a public employee.  [¶] (b) The writing was made at or near the time of the act, condition, or event.  [¶] (c) The sources of information and method and time of preparation were such as to indicate its

---

[11]  On appeal, Father does not contend the DCFS reports were business records, nor does he argue for the application of another hearsay exception.  Rather, he contends the reports were admissible because the "the writers of the DCFS reports were witnesses during the hearing, subject to cross examination."  To the extent Father is arguing the reports were admissible as prior inconsistent statements made by Morris and Richard (Evid. Code, § 1235), he does not identify any inconsistency between the witnesses' trial testimony and their statements in the reports.

trustworthiness."  Evidence Code section 1271, the business records exception, sets forth similar requirements for records made in the regular course of a business, except it also requires a custodian or other qualified witness to testify to the existence of the records and mode of preparation.  (See Evid. Code, § 1271, subd. (c).)

Father did not establish the foundational requirements for admissibility of the DCFS reports under Evidence Code section 1280 or section 1271 in either his declaration or at the evidentiary hearing.  At most, Morris testified she remembered the 2019 DCFS report and would have reviewed the report for accuracy at the time of preparing it.  But the document is not a single incident report; instead, it contains approximately two dozen dated entry logs.  Further, it appears Megerdichian, not Morris, authored most of the entries.  There was no testimony about how these entries were created.  Moreover, there was no testimony regarding the creation of the 2020 DCFS report, which includes about 20 entries apparently authored by Richard.  The court did not abuse its discretion in excluding the reports based on Father's failure to lay a foundation for the business records exception.  (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1011 ["A trial court has broad discretion in determining whether a sufficient foundation has been laid to qualify evidence as a business record."].)

Even if Father had established the DCFS reports were official records or business records, the family court did not abuse its discretion in excluding them.  As this court explained in *Zanone v. City of Whittier, supra*, 162 Cal.App.4th at page 192 in affirming the trial court's exclusion of a government agency's records of employee exit interviews, "[E]ven if they had been established as business records, [the records] themselves

19

contained hearsay statements regarding the employees' reasons for leaving for which no exception had been established. [Citations.] . . . A summary of an inadmissible hearsay statement cannot be made admissible merely because it is repeated in a valid business record." (Accord, *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1205 ["[w]hen multiple hearsay is offered, an exception for *each* level of hearsay must be found in order for the evidence to be admissible"]; see *People v. Sanchez* (2016) 63 Cal.4th 665, 675 ["An emergency room report, for example, may record the observations made by the writer, along with statements made by the patient. If offered for its truth, the report itself is a hearsay statement made by the person who wrote it. Statements of others, related by the report writer, are a second level of hearsay. Multiple hearsay may not be admitted unless there is an exception for each level."].)

The DCFS reports are replete with multiple levels of hearsay, and Father did not attempt to isolate the statements or to establish a hearsay exception at each level. For example, a March 21, 2019 entry authored by Megerdichian states, "CSW Megerdichian contacted [case social worker] Gorgi about the family's past referral. . . . [Gorgi] said she had spent time with the father and felt that [he] was a caring parent and did not observe any alarming matter." Father quoted the foregoing statement in his declaration and offered the reports for the truth of the matters asserted by Gorgi and others, yet he failed to establish any ground for admission of the embedded hearsay.

In addition to the DCFS reports, Father challenges the exclusion of emails he received from Brendan's therapists, including a September 28, 2020 email from Marsh stating Brendan was at risk for self-harm, and a March 17, 2017 email from Brendan's former therapist Victoria Frantz stating, "I

20

totally believe that you should have 50% custody." Father contends the emails are admissible because "[Father] is the custodian of records of his e-mails."[12] But the emails were properly excluded not because of a lack of authentication but because they contain hearsay. To the extent Father is relying on the business records exception under Evidence Code section 1271, there was no testimony that the emails from the therapists were made in the regular course of a business or that they were made at or near the time of the act, condition, or event. We also note the Frantz email was not relevant in that it predated both the August 2017 stipulated judgment and the July 2018 custody order.

The family court likewise did not abuse its discretion in excluding the 2015 declarations of Father's older children Anthony and Isabella and Father's neighbor John Storjev attesting to Father's positive parenting in 2011 (when Brendan and Luke were babies). These declarations are hearsay and not relevant to whether there were changed circumstances after the July 2018 custody order. (See *Perry v. Bakewell Hawthorne, LLC*

---

[12] Father also contends the family court improperly excluded a September 29, 2020 email from Pedrick forwarding Marsh's September 28 email. However, the record does not reflect that the court excluded the email at the evidentiary hearing. Pedrick wrote, "Brendan has been exhibiting harmful ideation. Ms. Marsh needs to discuss the concerns and engage you with a safety plan while we address positive intervention." (Underlining omitted.) The court allowed Father to examine Pedrick about the email and then ruled, "To the extent that there's another email, there's one by Ms. Marsh. So that would be hearsay and we don't have Ms. Marsh here to testify."

21

(2017) 2 Cal.5th 536, 541 ["Declarations themselves are not ordinarily admissible because they are hearsay."].)

Father also contends the family court erred in excluding all evidence Mother violated the July 2018 custody order. But the court admitted most of Father's exhibits on this subject, including Mother's communications, and it did not abuse its discretion in excluding the others. The court excluded the December 29, 2020 LASD incident report, in which the reporting officer described an interview with Luke about Brendan's refusal to get into Father's vehicle. The report contained two levels of hearsay, and Father did not establish the official records exception. The court also excluded a printout of photographs designated as "[r]ecently [d]eleted" on Father's electronic devices. Father authenticated the photographs in his declaration. However, the photographs had no relevance absent Father's hearsay statement that "Brendan stated his mother instructed him to delete any photos that included nightly Facetime calls that indicate I was not able to speak with him during his mother[']s custodial timeshare." Finally, the court excluded attendance reports from the boys' elementary school listing Mother as their contact. Father did not establish a foundation for admission of the report, and in any event, as the court explained to Father, "The printout that you have from the school doesn't verify that you're not a contact. It doesn't verify that there's somebody other than her who's a contact."

C.    *The Admissible Evidence Does Not Compel a Finding a Custody Modification Would Be in the Boys' Best Interests*
Father contends substantial evidence supported modification of the July 2018 custody order to award him joint legal and physical custody of the boys. Because the family court

22

found Father failed to carry his burden to show changed circumstances supported modification of the 2018 custody order, the question before us is whether the evidence compels a finding in Father's favor as a matter of law. (See *Juen, supra*, 32 Cal.App.5th at pp. 978-979; *Dreyer's, supra*, 218 Cal.App.4th at p. 838.) It does not.

Father argued there were two changed circumstances: Mother's efforts to alienate the boys from Father (especially Brendan), and Mother's repeated violations of the custody order.[13] With respect to parental alienation, the family court found credible Mother's testimony that she did not interfere with the boys' visits; specifically, she did not monitor the boys' calls and she did not direct Brendan to bring food or clothing to Father's house. Nor was there evidence she restricted Brendan from calling or spending time with Father. The court credited Father's testimony he had virtually no one-on-one time with Brendan, but the court found this was not attributable to Mother's conduct. The DCFS social workers—whom the court found credible—testified that Mother in 2019 engaged in concerning behaviors such as speaking negatively of Father in front of the children, coaching the children, and maintaining excessive contact with Brendan. However, Morris testified the social workers were not qualified to diagnose parental alienation, and both Morris and Richard testified the allegation Mother emotionally abused the boys was "unfounded." Moreover, Father did not introduce any admissible evidence the boys suffered from

---

[13]    Father argued there was a third changed circumstance— that Mother committed emotional child abuse—but the argument was based on his contention Mother engaged in parental alienation, which constituted child abuse.

either parental alienation or emotional abuse—he did not call any expert witnesses or treating therapists, instead relying solely on his own unqualified opinion based on texts and articles he characterized as "learned treatises" that were not in evidence.

Father also failed to show Mother violated the July 2018 custody order. There was no admissible evidence Brendan's refusal to go from Mother's car into Father's car during a scheduled hand-off on December 29, 2020 was due to Mother's conduct, and Mother's rejection of Father's demand to deliver the boys for a Sunday overnight visit on January 10, 2021 was based on a reasonable interpretation of the custody order (that she was entitled to custody of the boys as part of her winter vacation custody time). With respect to Mother's other alleged custody violations, the family court found Mother credibly testified, contrary to Father's allegations, that she did not deny Father access to the boys' health insurance, social security cards, and information pertaining to their schooling.

Father is correct there was undisputed evidence Brendan's mental and emotional well-being deteriorated after the July 2018 custody order, and in late 2020 Brendan expressed harmful ideation. Further, Brendan's therapist believed there was an acute threat of self-harm. This was certainly a significant changed circumstance. However, Father failed to present any evidence showing that an award of joint physical and legal custody to Father would benefit Brendan. (See *Montenegro, supra*, 26 Cal.4th at p. 256 [the court "should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest"].) Specifically, Father did not present any evidence, expert or otherwise, as to the underlying nature of Brendan's struggles or the best practices to address them.

Indeed, Father agreed with Mother's assessment that breaking up Brendan's week-long summer visits with Father in 2021 with occasional afternoon visits with Mother improved Brendan's emotional well-being compared to the summer of 2020.

D.    *Father Has Not Shown Additional Errors by the Family Court*

Father's additional contentions are not persuasive.  First, Father contends the family court's denial of the RFO is inconsistent with our observation in *Stacy V. v. Frank B., supra*, No. B293010 that "Father can prospectively seek to restore joint custody based on changed circumstances, including cessation of the abusive messages, reduction in parental conflict, control of his 'obsessive fixation' with the boys' athletic grooming, and compliance with the court's orders.  Further, even without a change of custody, Father could in the future present evidence that a modification of the visitation schedule (for example, by restoring a weekend night) is in the boys' best interest."  There is no inconsistency.  In his RFO, Father did not argue he moderated the behaviors that led to his loss of custody, nor did he request a limited modification of the vacation schedule.  Although we noted in our initial opinion that Father might in the future regain joint custody of the boys, the changed circumstances rule sets a high bar in recognition of "'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker. . . .'" (*Brown & Yana, supra*, 37 Cal.4th at p. 956.)

Second, Father argues there is a rebuttable presumption he was entitled to joint custody under Family Code section 3044, subdivision (a), which provides, "Upon a finding by the court that

a party seeking custody of a child has perpetrated domestic violence within the previous five years . . . against the child or the child's siblings. . ., there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child. . . ." This provision does not apply because there has been no finding Mother perpetrated domestic violence against either of the boys. To the contrary, after investigating referrals in 2019 and 2020, DCFS found the allegations of Mother's physical or emotional abuse to be unfounded.

Third, Father argues the family court took advantage of his self-represented status and "took over question[ing] of the DCFS witnesses in effect suppressing evidence." However, there is no rule that prevents a judge from questioning a witness. Further, while it is true the family court posed numerous questions to the DCFS witnesses, particularly during cross-examination, the court did not restrict Father's examination, and its questions did not have the effect of "suppressing evidence." To the contrary, many of the court's questions, especially during Father's direct examination, aided Father by reframing questions that were confusing or objectionable or elicited unclear responses. Our review of the hearing transcript shows the court to have been very patient with Father and to have taken pains to ensure a full and fair hearing.

Finally, Father contends the family court erred in denying his request to examine Pedrick (the boys' attorney) at the evidentiary hearing. The court advised Father that Pedrick was neither a party nor a percipient witness, and the court invited Father to make an offer of proof. Father stated only that he wanted to examine Pedrick about Pedrick's September 28, 2020

26

email stating Brendan had been exhibiting harmful ideation. The court allowed Father to question Pedrick in order to authenticate the email and the attached email from Marsh. On appeal, Father contends Pedrick was a percipient witness because he had "written his opinion of the proceedings in a responsive declaration" opposing the RFO. However, although Pedrick filed an opposition as counsel for Brendan and Luke on a mandatory family law form styled as a "responsive declaration to request for order" (Judicial Council FL-320), Pedrick's declaration asserted a legal position on behalf of the boys and did not contain factual testimony.[14] The court therefore did not abuse its discretion in refusing to allow Father to question Pedrick other than about the emails.

---

[14] Pedrick wrote in opposition to the RFO, "Legal custody has been adjudicated over the course of numerous hearings, trials, and appeals. [Father] has failed to introduce any credible, admissible evidence supporting his claim that there has been a significant change in circumstances warranting a modification of the current, operative child custody orders."

## DISPOSITION

We affirm the family court's August 6, 2021 order denying the RFO.  Mother is entitled to recover her costs on appeal.


                                        FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.